## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| MANUEL ABT, derivatively on behalf of WALMART, INC., | |
| | Case No. 21-cv-00172-CFC |
| Plaintiff, | |
| | |
| v. | **JURY TRIAL DEMANDED** |
| | |
| AIDA M. ALVAREZ, JAMES BREYER, M. MICHELE BURNS, JAMES I. CASH, JR., CESAR CONDE, ROGER C. CORBETT, PAMELA J. CRAIG, DOUGLAS N. DAFT, MICHAEL T. DUKE, STEPHEN J. EASTERBROOK, TIMOTHY P. FLYNN, SARAH J. FRIAR, CARLA A. HARRIS, THOMAS W. HORTON, MARISSA A. MAYER, C. DOUGLAS McMILLON, GREGORY B. PENNER, STEVEN S. REINEMUND, H. LEE SCOTT, ARNE M. SORENSON, KEVIN Y. SYSTROM, JIM C. WALTON, S. ROBSON WALTON, STEUART L. WALTON, CHRISTOPHER J. WILLIAMS and LINDA WOLF, | **Confidential Version Filed February 9, 2021** **Public Version Filed February 26, 2021** |
| Defendants, | |
| -and- | |
| WALMART, INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
## [PUBLIC VERSION]

Plaintiff Manuel Abt ("**Plaintiff**"), by and through his undersigned counsel, brings this Complaint against the defendants named herein derivatively on behalf of nominal defendant Walmart, Inc. ("**Walmart**" or the "**Company**").

The allegations in this Complaint are based on Plaintiff's knowledge as to himself and upon information and belief, including the investigation of counsel, the review of publicly available information, and the review of books and records produced by the Company in response to Plaintiff's demand made under 8 *Del. C.* § 220 (the "**Section 220 Demand**") as to all other matters, all of which books and records are expressly incorporated by reference into this Complaint. For the avoidance of doubt, this incorporation by reference does not change the pleading standard applicable to any motion to dismiss that may be filed in this case.

## PRELIMINARY STATEMENT

1.    Walmart's nearly 5,000 pharmacies nationwide have been dispensing highly addictive narcotic opioids for over a decade without adequate, legally required controls in place to prevent these drugs from being diverted for unlawful purposes.

2.    The Company's Board of Directors (the "**Board**") was indisputably placed on notice that its jerry-rigged controls were inadequate no later than 2011, when the Company entered into a settlement agreement with the Drug Enforcement Administration ("**DEA**"), which directed the Company to institute controls and

2

procedures consistent with its legal obligations under the Comprehensive Drug Abuse and Prevention Act of 1970, 21 U.S.C. §§ 801 *et seq.* (the "**Controlled Substances Act**" or "**CSA**").

3. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

4.      Unfortunately, this was of no consequence to the Board. As a result, the Company now faces thousands of lawsuits for its role in fueling the opioid epidemic that has left a national tragedy in its wake. As such, the Company's officers and directors who failed to discharge their fiduciary duties must be held to account for the damage they caused to the Company and that they caused the Company to commit upon society.

5.      The scourge of the opioid epidemic is well documented. Since 1999, when opioids were first heavily marketed as a "safe" pain management treatment, the amount of prescription opioids sold to pharmacies, hospitals, and doctors'

offices more than quadrupled. During this time, however, overdose deaths from opioids increased by a stunning 600 percent. Hundreds of thousands of people have died from overdosing on opioids. In 2017 alone, overdoses involving opioids killed more than 47,000 people, and 36% of those deaths involved prescription opioids. Millions of Americans struggle with opioid addiction every day.

6.     Despite the government's efforts to regulate prescription opioids, the opioid epidemic has continued unabated. Companies like Walmart expanded the opioid market by increasing the distribution and dispensing of prescription opioid drugs. The increased volume of opioid distribution led directly to skyrocketing addiction, overdose, and death. In October 2017, the President of the United States declared that the opioid "epidemic is a national public health emergency."

7.     For over a decade, Walmart's Board and respective committees have been asleep at the wheel in the face of the opioid epidemic. Plaintiff brings this stockholder derivative suit to hold the Board responsible for allowing this to happen.

## JURISDICTION AND VENUE

8.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), this Court has subject matter jurisdiction over Plaintiff's claims for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over each of the defendants because Walmart is incorporated in Delaware, which is in this District; and the other defendants are Walmart's current or former officers and/or directors. Each of the defendants has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court under 28 U.S.C. § 1391 because Walmart is incorporated in the State of Delaware, which is in this District.

## THE PARTIES

### Plaintiff

11.     Plaintiff is a current Walmart stockholder who has continuously held shares of Walmart common stock since 2010.

12.     Plaintiff made his initial demand to inspect the Company's books and records in connection with the claims herein on April 9, 2020.

13.     ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

**Nominal Defendant**

14.     Formerly known as Wal-Mart Stores, Inc., nominal defendant Walmart is a multinational retailer incorporated in Delaware with headquarters in Bentonville, Arkansas. It is the world's largest company by revenue and the world's largest employer, earning over $514 billion and employing over 2.2 million people worldwide as of 2019.

15.     In the United States, Walmart employs almost 1.5 million people and operates over 5,300 stores including Walmart Supercenters, Walmart Discount Stores and Sam's Club warehouse stores. Walmart operates approximately 5,000 pharmacies embedded in its Walmart and Sam's Club stores. According to *Becker's Hospital Review*, Walmart's pharmacy business earned $21.2 billion in prescription dispensing revenue in 2019, making it the fifth-largest pharmacy chain in the United States by that metric.

16.     As relevant to this Complaint, at all relevant times the Company's governance included an Audit Committee appointed by the Board to assist it in

overseeing the Company's compliance with its legal and regulatory requirements (the "**Audit Committee**").

**Defendants**

17.     Defendant Aida M. Alvarez ("**Alvarez**") joined the Board in 2006 and resigned in 2016. She received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $42,324 | $0 | $20,186 | $62,510 |
| 2016 | $83,654 | $174,979 | $0 | $258,633 |
| 2015 | $79,000 | $175,035 | $3,787 | $257,822 |
| 2014 | $94,378 | $175,025 | $0 | $269,404 |

18.     Defendant James Breyer ("**Breyer**") joined the Board in 2001 and resigned from the Board in June 2013. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $41,236 | $175,025 | $0 | $41,236 |

19.     Defendant M. Michele Burns ("**Burns**") joined the Board in 2003 and resigned from the Board in June 2013. She received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | Change in Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2014 | $34,725 | $0 | $13,907 | $2,542 | $51,174 |

20.    Defendant James I. Cash, Jr. ("**Cash**") joined the Board in 2006 and retired in 2018. He served on the Audit Committee from 2014-2018. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $58,077 | $0 | $935 | $59,012 |
| 2018 | $176,593 | $175,005 | $1,701 | $353,299 |
| 2017 | $169,000 | $174,978 | $19,937 | $363,915 |
| 2016 | $160,714 | $174,979 | $2,027 | $337,720 |
| 2015 | $151,500 | $175,035 | $3,486 | $330,021 |
| 2014 | $169,808 | $175,025 | $1,092 | $345,925 |

21.    Defendant Cesar Conde ("**Conde**") was appointed to the Board in February 2019 and is a member of the Audit Committee. Conde is also a director of PepsiCo and is a Trustee of the Aspen Institute and the Paley Center for Media. He is a Full Member at the Council on Foreign Relations and a Young Global Leader for the World Economic Forum. In 2020, he was named Chairman of NBCUniversal News Group. He has received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $89,739 | $228,209 | $0 | $317,948 |

22.    Defendant Roger C. Corbett ("**Corbett**") joined the Board in 2006 and retired in 2016. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $50,324 | $0 | $26,164 | $76,488 |

8

| | | | | |
|---|---|---|---|---|
| 2016 | $99,571 | $174,979 | $19,001 | $293,551 |
| 2015 | $91,000 | $175,035 | $41,300 | $307,335 |
| 2014 | $84,489 | $175,025 | $45,332 | $304,846 |

23.     Defendant Pamela J. Craig ("**Craig**") joined the Board in 2006 and resigned in 2017. She served on the Audit Committee in 2014-2016. She received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $38,077 | $0 | $0 | $38,077 |
| 2017 | $139,000 | $174,978 | $5,069 | $319,047 |
| 2016 | $128,654 | $174,979 | $0 | $303,633 |
| 2015 | $116,500 | $175,035 | $0 | $291,535 |
| 2014 | $22,741 | $93,936 | $0 | $116,677 |

24.     Defendant Douglas N. Daft ("**Daft**") joined the Board in 2005 and resigned in 2015. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | Change in Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $32,143 | $0 | $11,626 | $0 | $43,769 |
| 2015 | $79,000 | $175,035 | $10,254 | $282 | $264,571 |
| 2014 | $68,489 | $175,025 | $10,044 | $0 | $253,558 |

25.     Defendant Michael T. Duke ("**Duke**") joined the Board in 2008 and retired in 2016. He was the Company's President and CEO in 2013. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $38,324 | $0 | $243 | $38,567 |
| 2016 | $82,250 | $174,979 | $1,661 | $258,890 |

Duke also received the following compensation as the Company's President and CEO:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2014 | $1,366,593 | $0 | $2,846,793 | $490,090 | $4,703,476 |

26.    Defendant Stephen J. Easterbrook ("**Easterbrook**") joined the Board in 2018 and resigned in 2019. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $84,487 | $175,008 | $0 | $259,495 |
| 2019 | $58,766 | $174,970 | $0 | $233,736 |

27.    Defendant Timothy P. Flynn ("**Flynn**") joined the Board in 2012. He has been on the Audit Committee since at least 2014 and has been its Chairman since at least 2015. Flynn also serves as a member of the board of directors of JPMorgan Chase & Co., Alcoa Corporation and UnitedHealth Group, Inc. He is a member of the board of trustees of the University of St. Thomas, St. Paul, Minn. He has previously served as a member of the board of directors of The Chubb Corporation, as a trustee of the Financial Accounting Standards Board, a member of the World Economic Forum's International Business Council, and a director of the

International Integrated Reporting Council. He received the following compensation

as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $124,946 | $175,008 | $676 | $300,630 |
| 2019 | $210,926 | $174,970 | $1,247 | $387,143 |
| 2018 | $205,070 | $175,005 | $1,654 | $381,729 |
| 2017 | $176,500 | $174,978 | $32,886 | $384,364 |
| 2016 | $166,154 | $174,979 | $1,579 | $342,712 |
| 2015 | $143,217 | $175,035 | $4,178 | $322,430 |
| 2014 | $143,489 | $175,025 | $2,298 | $320,812 |

28.     Defendant Sarah J. Friar ("**Friar**") joined the Board in February 2018.

She has been a member of the Audit Committee since joining the Board. Friar is also

CEO of Nextdoor, the world's largest private social network for neighborhoods and

previously served as Chief Financial Officer at Square and as Senior Vice President

of Finance & Strategy at Salesforce. She previously worked at Goldman Sachs and

McKinsey. She received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $118,018 | $175,008 | $0 | $293,026 |
| 2019 | $131,575 | $230,098 | $0 | $361,673 |

29.     Defendant Carla A. Harris ("**Harris**") joined the Board in 2017. She

has served as vice chair of Wealth Management and head of Multicultural Client

Strategy for Morgan Stanley since August 2013 and as managing director and senior

client advisor since June 2012. In August 2013, President Barack Obama appointed

Harris to serve as chair of the National Women's Business Council. She currently serves on the boards of several nonprofit organizations, including St. Vincent's Health Care and the Morgan Stanley Foundation. She received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $99,909 | $175,008 | $1,060 | $275,977 |
| 2019 | $95,770 | $174,970 | $0 | $270,740 |
| 2018 | $52,152 | $175,005 | $0 | $227,157 |

30.    Defendant Thomas W. Horton ("**Horton**") joined the Board in November 2014. He has been a member of the Audit Committee since at least 2015. Horton is a Partner at Global Infrastructure Partners, a global infrastructure investment firm, and previously served as Senior Advisor at Warburg Pincus LLC. He was the chairman of American Airlines Group, Inc. and its predecessors from 2011 to 2014. He has been a director of Qualcomm Incorporated since 2008, and a director of General Electric Company since 2018. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $157,111 | $175,008 | $1,027 | $333,146 |
| 2019 | $193,214 | $174,970 | $853 | $369,037 |
| 2018 | $146,593 | $175,005 | $915 | $322,513 |
| 2017 | $139,000 | $174,978 | $3,583 | $317,561 |
| 2016 | $128,654 | $174,979 | $411 | $304,044 |
| 2015 | $15,845 | $94,469 | $0 | $110,314 |

31.     Defendant Marissa A. Mayer ("**Mayer**") joined the Board in 2012. She is the co-founder of Lumi Labs, Inc., a technology incubator focused on consumer internet technologies. From 2012-2017, she was President, CEO and a director of Yahoo!, Inc. She serves on the boards of the Stanford Children's Hospital, the San Francisco Museum of Modern Art, the San Francisco Ballet, and the foundation board for the Forum of Young Global Leaders at the World Economic Forum. She received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $99,936 | $175,008 | $0 | $274,944 |
| 2019 | $95,836 | $174,970 | $0 | $270,806 |
| 2018 | $89,985 | $175,005 | $2,210 | $267,200 |
| 2017 | $90,000 | $174,978 | $1,830 | $266,808 |
| 2016 | $90,000 | $174,979 | $0 | $264,979 |
| 2015 | $90,000 | $175,035 | $3,277 | $268,262 |
| 2014 | $83,489 | $175,025 | $5,093 | $263,607 |

32.     Defendant C. Douglas McMillon ("**McMillon**") has served as the Company's President and CEO since 2014 and has been a director since 2013. He is the Chairman of the Executive Committee. He has worked at Walmart for nearly 30 years in a number of capacities and in senior leadership roles in all of Walmart's business segments. During his time at the Company as CEO, McMillon has received the following compensation:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan Comp. | Change Change in Pension Value and Non-qualified Deferred Comp. Earnings | All Other Comp. | Total |
|---|---|---|---|---|---|---|
| 2020 | $1,276,892 | $15,709,953 | $3,516,817 | $1,191,597 | $410,091 | $22,105,350 |
| 2019 | $1,276,892 | $15,592,404 | $5,088,000 | $1,090,984 | $569,953 | $23,618,233 |
| 2018 | $1,276,982 | $15,692,464 | $4,736,750 | $611,315 | $473,765 | $22,791,276 |
| 2017 | $1,278,989 | $15,224,706 | $4,851,561 | $510,155 | $486,732 | $22,352,143 |
| 2016 | $1,263,231 | $14,270,786 | $3,406,971 | $404,755 | $463,054 | $19,808,797 |
| 2015 | $1,200,930 | $14,597,374 | $2,878,272 | $322,359 | $393,673 | $19,392,608 |
| 2014 | $954,408 | $23,011,020 | $1,035,019 | $338,400 | $254,091 | $25,592,938 |

33.    Defendant Gregory B. Penner ("**Penner**") has been a director since 2008 and Chairman of the Board since 2015. Penner is founder and general partner of Madrone Capital Partners, an investment management firm. Penner is only the third person to serve as Chairman of the Board, following his father-in-law, defendant Rob Walton, and the company's founder, Sam Walton. Penner has worked at Walmart for over 20 years in a number of senior capacities. He has received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $212,590 | $287,468 | $0 | $500,058 |
| 2019 | $203,264 | $287,522 | $0 | $490,786 |
| 2018 | $190,036 | $275,007 | $0 | $465,043 |
| 2017 | $194,000 | $274,976 | $0 | $468,976 |

| | | | | |
|---|---|---|---|---|
| 2016 | $155,604 | $274,998 | $889 | $431,491 |
| 2015 | $114,000 | $175,035 | $0 | $289,035 |
| 2014 | $103,489 | $175,025 | $231 | $257,046 |

34.     Defendant Steven S. Reinemund ("**Reinemund**") joined the Board in 2010. Reinemund previously worked at PepsiCo for 23 years, including as President and CEO from 2001-2006, and as Chairman of its board of directors in 2006 and 2007. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $125,000 | $175,008 | $2,196 | $302,204 |
| 2019 | $120,879 | $174,970 | $783 | $296,632 |
| 2018 | $112,953 | $175,005 | $0 | $287,958 |
| 2017 | $114,000 | $174,978 | $809 | $289,787 |
| 2016 | $103,654 | $174,979 | $405 | $279,038 |
| 2015 | $99,000 | $175,035 | $4,077 | $278,112 |
| 2014 | $79,808 | $175,025 | $2,213 | $257,046 |

35.     Defendant H. Lee Scott, Jr. ("**Scott**") joined the Board in 1999 and resigned in 2014. Scott received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2015 | $32,349 | $0 | $0 | $32,349 |
| 2014 | $68,489 | $175,025 | $1,146 | $244,660 |

36.     Defendant Arne M. Sorenson ("**Sorenson**") joined the Board in 2008 and resigned in June 2013. Sorenson received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2014 | $26,044 | $0 | $0 | $26,044 |

37. Defendant Kevin Y. Systrom ("**Systrom**") joined the Board in September 2014 and retired in 2018. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $45,650 | $0 | $0 | $45,650 |
| 2018 | $109,964 | $175,005 | $0 | $284,969 |
| 2017 | $114,000 | $174,978 | $0 | $288,978 |
| 2016 | $101,538 | $174,979 | $0 | $276,517 |
| 2015 | $23,723 | $121,313 | $0 | $145,036 |

38. Defendant Jim C. Walton ("**Jim Walton**") joined the Board in 2005 and resigned in 2016. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $42,324 | $0 | $3,606 | $45,930 |
| 2016 | $86,250 | $174,979 | $1,674 | $262,903 |
| 2015 | $79,000 | $175,035 | $682 | $254,717 |
| 2014 | $68,489 | $175,025 | $3,575 | $247,089 |

39. Defendant S. Robson Walton ("**Rob Walton**") joined the Board in 1978. Son of Walmart founder Sam Walton, Rob Walton joined the Company in 1969 and served as Chairman of the Board from 1992 to 2015. Prior to becoming Chairman, he held a variety of senior positions with Walmart, including Senior Vice

President, corporate Secretary, General Counsel, and Vice Chairman. He has received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $100,000 | $175,008 | $0 | $275,008 |
| 2019 | $95,879 | $174,970 | $1,544 | $272,393 |
| 2018 | $90,000 | $175,005 | $0 | $265,005 |
| 2017 | $94,000 | $174,978 | $0 | $268,978 |
| 2016 | $90,000 | $174,979 | $192 | $265,171 |
| 2015 | $45,000 | $162,530 | $0 | $207,530 |

40.    Defendant Steuart L. Walton ("**Steuart Walton**") joined the Board in 2016. Grandson of Walmart founder Sam Walton, Steuart Walton is founder and chairman of RZC Investments, an investment business in Bentonville, Arkansas, the founder and former chief executive officer of Game Composites, a manufacturer of carbon fiber aircraft and aircraft parts, and a director of Rapha Racing Limited, a cycling apparel business. He is a board member of Crystal Bridges Museum of American Art, Smithsonian National Air and Space Museum, and Leadership for Education Equity. He received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2020 | $120,066 | $175,008 | $0 | $295,074 |
| 2019 | $107,556 | $174,970 | $0 | $282,526 |
| 2018 | $89,985 | $175,005 | $0 | $264,990 |
| 2017 | $51,923 | $174,978 | $0 | $226,901 |

41.     Defendant Christopher J. Williams ("**Williams**") joined the Board in 2004 and resigned in 2014. He served as Chair of the Audit Committee in 2014 and received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2015 | $53,602 | $0 | $4,470 | $58,072 |
| 2014 | $208,489 | $175,025 | $1,307 | $384,821 |

42.     Defendant Linda Wolf ("**Wolf**") joined the Board in 2005 and resigned in 2017. She received the following compensation as a director:

| Fiscal Year | Fees | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $48,654 | $0 | $167 | $48,821 |
| 2017 | $119,000 | $174,978 | $21,148 | $315,126 |
| 2016 | $115,000 | $174,979 | $0 | $289,979 |
| 2015 | $119,000 | $175,035 | $1,863 | $295,898 |
| 2014 | $108,489 | $175,025 | $837 | $284,351 |

43.     Defendants Conde, Flynn, Friar, Harris, Horton, Mayer, McMillon, Penner, Reinemund, Rob Walton, and Steuart Walton are collectively referred to as the "**Current Director Defendants**."

44.     Defendants Cash, Conde, Craig, Flynn, Friar, Horton, and Williams are sometimes collectively referred to as the "**Audit Committee Defendants**."

45.     Altogether, the Current Director Defendants plus defendants Alvarez, Breyer, Burns, Cash, Corbett, Craig, Daft, Duke, Easterbrook, Scott, Systrom,

Sorenson, Jim Walton, Williams, and Wolf are collectively referred to as the "**Individual Defendants**."

<div align="center">

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

</div>

**Fiduciary Duties**

46.     As current or former directors of the Company, each of the Individual Defendants owes Walmart and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and must use his or her utmost ability to control and manage Walmart in a fair, just, honest, and equitable manner. The Individual Defendants must act in furtherance of the best interests of Walmart and not in furtherance of their personal interest or benefit.

47.     To discharge their duties, the Individual Defendants must exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. This includes:

a.     ensuring that the Company operates in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations;

b.     ensuring that the Company complies with its legal obligations and requirements and refrains from engaging in unlawful or deceptive conduct;

c.     conducting the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations to

<div align="center">

19

</div>

maximize performance of its business, avoid wasting the Company's assets, and

maximize the value of the Company's stock; and

        d.     remaining informed of how the Company conducts its operations

and, upon receipt of notice or information of imprudent or unsound conditions or

practices, making reasonable inquiry and taking steps to correct such conditions or

practices and make such disclosures as necessary to comply with applicable laws.

## Additional Duties Under Walmart's Code of Ethics

48.    Walmart holds its fiduciaries to a specific code of conduct beyond the

requirements of law. The Company has adopted a Global Statement of Ethics (the

"**Code of Ethics**"). As defendant McMillon states in the introduction to the Code of

Ethics:

> Regardless of where each of us works in our global company, this Statement of Ethics is the guide to exemplifying integrity as a Walmart associate. It's a daily resource for making honest, fair and objective decisions while operating in compliance with all laws and our policies. This Statement of Ethics applies to me, the board of directors and all associates at every level of our organization. … We believe in everyday low costs and everyday low prices, but only if accomplished through our everyday integrity.

49.    The Code of Ethics expressly states that it applies to each of the

Individual Defendants as members of the Board:[1]

> **Our Statement of Ethics applies to** all associates at all levels of the organization worldwide and **all members of the board of**

---

[1] Emphasis is added to all quotations in this Complaint unless otherwise indicated.

20

**directors of Wal-Mart Stores, Inc.** It also applies to all associates and directors of Walmart-controlled subsidiaries.

50.   The Code of Ethics imposes specific duties on Walmart associates, which includes the Individual Defendants:

Associate Responsibilities

Every Walmart associate has responsibility to:

- **Follow the law at all times**. If you see any associate violating the law, or if you're asked to do something you believe may violate the law, discuss it immediately with your manager or Global Ethics.

  **…**

- **Learn the policies that apply to your job.** No one expects you to memorize every policy, but it's good to have a basic understanding of the issues covered by each policy.

  …

- **Immediately raise any concern you or others may have about possible** requests or **acts that may be a violation of this Statement of Ethics or a Walmart policy**.

  …

- Raise any ethics concerns … by contacting Global Ethics[.]

51.   The Code of Ethics imposes additional specific duties on the Individual Defendants as "management associates:"

Additional Responsibilities for Management

All management associates are responsible for creating an environment that encourages compliance with our Statement of Ethics. **Supervision of responsible business practices is as important as supervision of performance.**

…

- If there is a conflict between our ethics and business objectives, ensure our ethics always come first[.]

52.     The Code of Ethics imposes additional specific duties bearing on health and safety, which presumably encompasses the distribution and dispensing of highly addictive narcotic opioids:

**Health & Safety**

Walmart is also committed to protecting the health and safety of our associates, members, customers and communities because we care for one another's well-being. Conducting our business in compliance with all health and safety laws is crucial to protecting each other from harm. As associates of Walmart, we must always comply with all relevant health and safety laws and policies and never ignore a potential health and safety concern.

**Additional Duties under the Corporate Governance Guidelines**

53.     The Company also has Corporate Governance Guidelines setting forth additional duties of the Individual Defendants as members of the Board. The Corporate Governance Guidelines provide, in relevant part:

The following Corporate Governance Guidelines have been adopted by the [Board] to assist the Board in the exercise of its responsibilities to our shareholders and the Company. These Guidelines should be interpreted in the context of all applicable laws and the Company's Restated Certificate of Incorporation, Amended and Restated Bylaws and other corporate governance

22

documents. Therefore, these Guidelines are intended to serve as a flexible framework within which the Board may conduct its business and not as a set of legally binding obligations. The Board may, in its discretion, deviate from these Guidelines from time to time as the Board deems appropriate or as required by applicable laws and regulations.

\*\*\*

1.      Director Responsibilities

The basic responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the shareholders and the Company, and to perform their duties of care and loyalty….

The specific duties and responsibilities of the Board will include, among other things, overseeing the management of the business and affairs of the Company…. [O]verseeing the Company's policies with respect to compliance with applicable laws and regulations and adopting policies of corporate conduct designed to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls[.]

…

The Company shall engage in an agenda review process for each Board meeting, which shall include the Chairperson, the Lead Independent Director, and the chairperson of each Board committee. At the conclusion of this agenda review process, the Chairperson of the Board and the Lead Independent Director shall jointly approve the agenda for each Board meeting. At the beginning of the year, the Chairperson of the Board and the Lead Independent Director will establish a schedule of agenda subjects to be discussed during the year (to the degree this can be foreseen). Each director is free to suggest the inclusion of items on the agenda. Each director is free to raise at any Board meeting subjects that are not on the agenda for that meeting. The Board will review the Company's long-term strategic plans and the

principal issues that the Company will face in the future during at least one Board meeting each year.

\*\*\*

6.      Annual Performance Evaluation

The Board and the committees will conduct annual self-evaluations to determine whether they are functioning effectively. The Nominating and Governance Committee will receive comments from all directors and report annually to the Board with an assessment of the Board's performance, as well as the performance of the committees. This will be discussed with the full Board following completion of the assessment. The assessment will focus on the Board's and each committee's contribution to the Company and specifically focus on areas in which the Board and each committee believe improvement could occur.

## Additional Duties of the Audit Committee Defendants

54.      The Audit Committee Defendants also owe Walmart specific additional duties under the Audit Committee charter (the "**Audit Charter**"):

Purpose

The Audit Committee is appointed by the [Board] to: (1) assist the Board in the oversight and monitoring of… the compliance by the Company with legal and regulatory requirements[.]

…

Committee Authority and Responsibilities

The basic responsibility of the members of the Audit Committee is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders….

…

The Audit Committee shall oversee the integrity of the… internal controls of the Company, … oversee management's development of, and adherence to, a sound system of internal controls…. It is the responsibility of… management of the Company, under the oversight of the Audit Committee and the Board, to assure compliance by the Company with applicable legal and regulatory requirements[.]

…

Ethics and Compliance Oversight Responsibilities

…

29. Discuss with management… and advise the Board with respect to, the Company's policies, processes and procedures regarding compliance with applicable laws and regulations and the Statement of Ethics, and instances of non-compliance therewith.

**Breaches of Duties**

26.   The Individual Defendants knowingly and culpably violated their obligations as members of the Board. As set forth in greater detail below, the Individual Defendants' actions and conscious failures to act resulted in the Company systematically filling facially suspicious opioid orders and failing to report suspicious orders as required by the laws governing controlled substances.

27.   The Individual Defendants breached their duty of loyalty and good faith by causing, allowing their fellow Individual Defendants to cause, or failing to

prevent their fellow Individual Defendants from causing, the Company to engage in the improper practices that caused substantial damage to the Company.

28.     As members of the Board, the Individual Defendants exercised control over the wrongful acts complained of herein and failed to prevent their fellow Individual Defendants from committing such wrongful acts, which have caused the Company substantial damage.

29.     As members of the Audit Committee, the Audit Committee Defendants failed to properly oversee the Company's compliance with legal requirements and the Company's own policies.

## **THE REGULATORY FRAMEWORK GOVERNING OPIOIDS**

### **Congress Enacts the CSA to Address Drug Abuse in the United States**

30.     Enacted in 1970, the Controlled Substances Act created a category of drugs, known as "controlled substances," that are subject to strict federal monitoring and regulation based on their potential for abuse. The CSA recognized that while "[m]any of the drugs included within this title have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American public[,]" the illicit traffic and use of controlled substances has "a substantial and detrimental effect on the health and general welfare of the American people."

31.    Accordingly, the CSA sought to promote public health by making medication available to patients while also protecting public safety by curbing illicit diversion. As described in Section 309 of the Uniform Controlled Substances Act, "diversion" means "the transfer of a controlled substance from a lawful to an unlawful channel of distribution or use." The diversion of pharmaceutical controlled substances can occur in a number of ways, including, but not limited to prescriptions written for other than a legitimate medical purpose; pharmaceutical controlled substances stolen by pharmacy personnel; and pharmacists not exercising their coordinating responsibility to ensure that prescriptions are valid.

32.    The CSA seeks to prevent the diversion of controlled substances into illicit markets by establishing a closed regulation and monitoring system, under which it is unlawful to distribute, dispense, or possess any controlled substance except in a manner authorized by law. *See* 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100. The CSA and its implementing regulations govern every step in the handling of certain drugs, from their production in a manufacturing facility, to their distribution from a warehouse, and from their prescription by a doctor to their being dispensed by a pharmacy filling the prescription.

33.    Thus, each part of the supply chain – including manufacturers, distributors, prescribers, and pharmacies – must register with the DEA and comply

27

with the CSA and its implementing regulations. *See* 21 U.S.C. §§ 822(a)(2) and 823(f).

34.     Entities who register with DEA (known as "registrants") agree to comply with the CSA and its implementing regulations, and may manufacture, distribute, prescribe, or dispense controlled substances only to the extent authorized by their registration and the law. *See* 21 U.S.C. §§ 822(a)–(b), 823(f).

35.     Walmart, which operated extensively as both a pharmacy and a distributor, was a registrant under the CSA and thus undertook significant CSA obligations. *See* 21 C.F.R. §1300.02(b).

**Pharmacies Must Abide by the CSA to Receive and Dispense Controlled Substances**

36.     "Dispensing" means delivering a controlled substance to an end user pursuant to a physician's prescription. *See* 21 U.S.C. § 802(10); 21 C.F.R. §§ 1300.01, 1306.03(a). Dispensing is ordinarily the last step in the closed distribution system. Walmart operates pharmacies that "dispense" controlled substances.

37.     The CSA designates pharmacies as "practitioners" that are permitted to handle controlled substances if they adhere to the course of "professional practice." *See* 21 U.S.C. § 802(21).

38.     Pharmacies that wish to dispense controlled substances are required under the CSA to register with the Attorney General. *See* 21 U.S.C. § 823(f) ("The Attorney General shall register … pharmacies, as distinguished from pharmacists

… to dispense … controlled substances…."). The Attorney General has delegated this authority to the DEA. *See* 28 C.F.R. § 0.100; 21 C.F.R. § 1300.01.

39.     The DEA reviews applications for registration (and renewals of registration) by pharmacies and, where necessary, pursues revocations of registrations. In deciding whether to issue or deny a registration for a pharmacy, the DEA considers various factors, including whether the applicant for registration has complied with the laws relating to controlled substances and its other conduct related to public health and safety. *See* 21 U.S.C. § 823(f).

**Pharmacies May Only Dispense Controlled Substances if the Prescription Meets Standards**

40.     In general, the CSA prohibits pharmacies from dispensing most controlled substances without a "prescription issued by a practitioner." *See* 21 U.S.C. §§ 829(a), (b); 842(a)(1).

41.     The Attorney General has promulgated rules for when prescriptions may be filled pursuant to a prescription in accordance with 21 U.S.C. § 829. *See* 21 C.F.R. § 1306.01

42.     Part 1306 sets forth three rules that pharmacies must follow when dispensing controlled substances. For each prescription, the pharmacist must (i) determine that the prescription was issued by a medical practitioner in the usual course of his or her professional practice, (ii) determine that the prescription is for a

29

legitimate medical purpose, and (iii) in filling the prescription, adhere to the usual course of his or her own professional pharmacy practice.

43.    Walmart was required to adhere to these three requirements in its role as a pharmacy dispensing controlled substances.

44.    In evaluating the validity of a controlled-substance prescription, pharmacists cannot rely exclusively on the fact that it was issued by a medical practitioner. Rather, to assess a prescription's validity, a pharmacist must consider any signs that a prescription may be invalid or that the controlled substances may be abused or misused.

45.    Pharmacists call these signs of invalidity "red flags." Red flags may arise based on the prescriber who issued the prescription (*e.g.*, where a prescriber issues many more prescriptions of opioids for higher quantities than do comparable prescribers), the prescription itself (*e.g.*, where the combination of drugs prescribed is frequently sought by individuals known to abuse or misuse prescription drugs for nonmedical purposes), or the individual presenting the prescription (*e.g.*, where a patient repeatedly seeks early refills).

46.    One of the key professional responsibilities of a pharmacist, when presented with a prescription for controlled substances, is to identify and resolve any "red flags" before filling the prescription. This responsibility is ingrained in the

training of pharmacists, by pharmacists at professional conferences, and in training materials prepared by pharmacy boards.

47.     This responsibility also has been recognized as an important safeguard against the abuse of controlled substances. For example, in 2014, the National Association of Boards of Pharmacy released a video called "Red Flags," which observed that "by recognizing red flags to help establish the validity of a prescription, the pharmacist becomes the last line of defense in preventing misuse." The video states, "problem prescriptions can often be identified by using common sense, practicing good pharmacy, and looking for red flags that suggest the prescription may not be legitimate."

48.     When a pharmacist identifies red flags but is able to resolve them, the pharmacist has an additional professional responsibility: to document the resolution of the red flags. In other words, pharmacists were trained that, when presented with a controlled-substance prescription bearing a significant red flag, they needed – as part of the usual course of professional pharmacy practice – to investigate and either (i) resolve the red flag before dispensing *and* document the resolution, or (ii) refuse to fill the prescription. The documentation ensures that the information about the red flag and its resolution is available for future reference, and the absence of documentation can indicate that the pharmacist did not successfully resolve the red flag.

31

49.    Failure to fulfill this responsibility is a violation of 21 C.F.R. § 1306.06, which requires that a pharmacist's conduct, when filling controlled-substance prescriptions, must adhere to the usual course of the pharmacist's professional practice.

**Violations Subject the Pharmacy to Civil Penalties and Other Sanctions**

50.    The CSA makes it unlawful "for any person … subject to the requirements of Part C [21 U.S.C. §§ 821-32] to distribute or dispense a controlled substance in violation of section 829." 21 U.S.C. § 842(a)(1). A person dispensing controlled substances not in compliance with any of the three requirements identified above violates 21 U.S.C. § 829 and thus 21 U.S.C. § 842(a)(1).

51.    When a corporation's agents or employees violate the rules for dispensing controlled substances, the corporate entity may be held liable for the civil penalty. Corporations must comply with the CSA when they engage in activities covered by the CSA or its implementing regulations, such as operating a pharmacy that dispenses controlled substances. *See* 21 U.S.C. §§ 822(b), 823(f). While the CSA, in 21 U.S.C. § 842(a)(1) and (c)(1), makes a "person" liable for civil penalties, a corporate entity may be the "person" that fills prescriptions through its agents, as the CSA's regulations expressly define "person" to include corporations. *See* 21 C.F.R. §§ 1300.01, 1306.02.

52.     The CSA also authorizes the Attorney General to seek "appropriate declaratory and injunctive relief relating to violations of … section 842 … of this title," 21 U.S.C. § 843(f)(1), and permits the Court to issue an order "tailored to restrain violations of … section 842 of this title." 21 U.S.C. § 843(f)(3).

**Distributors Must Abide by Legal Obligations When Receiving Controlled Substance Orders from Pharmacies**

53.     The CSA defines a "distributor" as a person or an entity that delivers (other than by administering or dispensing) a controlled substance. The CSA defines "delivery" as the "actual, constructive, or attempted transfer of a controlled substance…." *See* 21 U.S.C. §§ 802(8), (11).

54.     Many pharmacies obtain controlled substances from independent distributors. Walmart, however, acted as its own distributor from 2000 until 2018, operating at least six distribution centers in the United States to fulfill orders for its 5,000 pharmacies nationwide. Between 2012 and 2018, Walmart was the largest self-distributor in the United States – in terms of both dosage units and grams – for opioids including oxycodone, hydromorphone, and hydrocodone.

55.     Distributors of controlled substances are required by the CSA to register with the DEA and to maintain effective controls against the diversion of controlled substances for illegitimate uses. *See* 21 U.S.C. § 823(b)(1) (requiring the Attorney General, in registering a distributor, to consider whether the distributor has shown "maintenance of effective control against diversion of particular controlled

substances into other than legitimate medical, scientific, and industrial channels."). The Attorney General has delegated this authority to the DEA. *See* 28 C.F.R. § 0.100; 21 C.F.R. § 1300.01. As a distributor in this closed system, Walmart is required by the CSA to register with the DEA. *See* 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.

56.   The DEA is charged with administrating the CSA and observing Walmart's facilities to ensure that the Company's operations are "consistent with the public interest." 21 U.S.C. § 824(a)(4); 28 C.F.R. § 0.100; 21 C.F.R. § 1301.71. In evaluating whether the Company's operations satisfy its legal obligations to serve the "public interests," the DEA considers: (i) whether Walmart has maintained "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels"; (ii) whether Walmart has complied with applicable state and local laws; (iii) whether Walmart has previously been convicted under federal or state laws for a crime related to the sale of controlled substances; (iv) Walmart's past experience with controlled substances; and (v) "such other factors as may be relevant to and consistent with the public health and safety." 21 U.S.C. § 823(b), (e). The DEA is "not required to make findings as to all of the[se] factors," and "may give each factor the weight he deems appropriate." If Walmart's operations fail to meet the public-interest standard, the DEA may suspend or even permanently revoke the Company's registration. *See* 21

U.S.C. § 824(a)(4). Under the CSA, the DEA is also authorized to immediately suspend any DEA registration, and keep that registration suspended during the pendency of administrative revocation proceedings, where it finds that there is an "imminent danger to the public health or safety." 21 U.S.C. § 824(d) (2012); 21 C.F.R. § 1301.36(e) (2017). Prior to 2016, "imminent danger" was undefined, but the DEA routinely identified "imminent dangers" where a registrant failed to put in place sufficient controlled substances diversion prevention systems.

57.     The CSA requires Walmart to put in place "effective control[s] against the diversion" of controlled substances. 21 C.F.R. § 1301.71(a). Thus, the DEA demands that Walmart "design and operate a system" to identify "suspicious orders of controlled substances" and report those orders to the DEA. 21 C.F.R. § 1301.74(b). "Suspicious orders" are defined by the DEA as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b). Courts have interpreted Section 1301.74(b) to be an illustrative rather than an exclusive list of examples of suspicious orders, and thus, distributors like Walmart must use their independent judgment to identify unusual orders.

58.     Should Walmart fail to live up to its obligations under the CSA, the DEA may impose a civil penalty of up to $10,000 for *each* violation of the reporting requirement. *See* 21 C.F.R. § 842(c)(1)(B).

59.     The Company's obligation to report "suspicious orders" is not onerous. It merely requires that Walmart provide basic information about certain orders to the DEA, so that DEA "investigators in the field" can aggregate reports from every point along the legally regulated supply chain and use the information to ferret out "potential illegal activity."

**The Rise of Prescription Opioids**

60.     Prescription opioids are powerful drugs to treat pain that are derived from the opium poppy plant. While often very effective, prescription opioids are also very addictive. Most patients receiving more than a few weeks of opioid therapy will experience prolonged withdrawal symptoms. Patients often develop a tolerance to opioids and require ever-higher doses in order to obtain the same relief, increasing the risks of withdrawal, addiction, and overdose. Because they are so susceptible to addiction and abuse, opioids are categorized as "Schedule II Controlled Substances." The DEA website explains that Schedule II drugs have "a high potential for abuse, with use potentially leading to severe psychological or physical dependence. These drugs are also considered dangerous."

61.     Because of these dangers, doctors have historically prescribed opioids only for short-term acute pain – where brief use limited the need for escalating doses and the risk of addiction was minimal – and for terminal illnesses and end-of-life care. These narrow uses meant that the market for prescription opioids was

historically limited and only marginally profitable. This is not the case today. Today, opioids are the most prescribed class of drugs in the United States.

62.    The roots of the opioid epidemic date back to the mid-1990s when opioid manufacturers, such as Purdue Pharma, Johnson & Johnson, Teva Pharmaceutical Industries and others set out to enlarge the narrow opioid patient profile by reversing the traditional understanding of opioid use and creating a false narrative that they were relatively benign forms of pain relief akin to over-the-counter remedies.

63.    To convince doctors to prescribe more opioids in lieu of traditional pain relivers, opioid manufacturers executed massive, concerted, and unprecedented marketing campaigns that falsely minimized the risks and exaggerated the benefits of long-term opioid use to treat a wide range of conditions. Among other things, opioid manufacturers: (i) deceptively promised that long-term opioid use would improve patients' function and quality of life; (ii) trivialized or obscured the serious risks and adverse outcomes, including the risk of addiction, overdose, and death, associated with opioid use; (iii) overstated the effectiveness of opioids compared with other treatments; and (iv) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms. Opioid manufacturers also deceptively marketed opioids for indications and benefits that were outside of the drugs' FDA-approved purposes, an unlawful practice called "off-label marketing."

Indeed, opioids became ubiquitous–even treating sore muscles from exercising, tenderness after a routine dental cleaning, or a stiff neck from sleeping in an awkward position.

64.     The opioid manufacturers' marketing and promotional efforts included, among other things, disseminating favorable "educational" materials, advertising in print and online, sponsoring continuing medical education courses, and hiring "key opinion leaders" to act as consultants, lecturers, and influencers. These efforts were meant to increase the market for opioids by changing doctors' behavior so that they would prescribe opioids for chronic non-cancer pain.

65.     The opioid manufacturers' deceptive marketing schemes were overwhelmingly successful, resulting in a dramatic shift in the public and medical opinion about the use of opioids. Between 2000 and 2011, sales of prescription opioids in the U.S. quadrupled. In 2012, healthcare providers wrote 259 million prescriptions for opioid painkillers – enough to medicate every adult in America around the clock for one month. Opioids, once a niche drug, became the most prescribed class of drugs in the United States.

**A Public Health Emergency**

66.     It should have been obvious that opioids were being overprescribed. Over the past two decades, opioid overdoses resulting from over-prescription have killed more than 200,000 people. Millions of Americans continue to suffer daily

from opioid addiction. As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and the present, the life expectancy for Americans has decreased for the first time in recorded history. Drug overdoses are now the leading cause of death for Americans under fifty years old.

67.     In May 2010, the Obama administration released its inaugural National Drug Control Strategy, which stated that "[p]rescription drug abuse is the Nation's fastest-growing drug problem," and recognized that "opiate overdoses, once almost always due to heroin use, are now increasingly due to abuse of prescription painkillers." In July 2016, Congress passed, and President Obama signed, the Comprehensive Addiction and Recovery Act of 2016, which authorized $181 million in additional annual funding for initiatives aimed at addressing the opioid crisis.

68.     In October 2017, the Trump Administration declared the American opioid epidemic a public health emergency. According to the *New York Times*, "[p]ublic health officials have called the current opioid epidemic the worst drug crisis in American history."

## WALMART'S PHARMACY BUSINESS VIOLATED THE CSA

69.   Walmart has violated the CSA's dispensing rules on a sweeping national scale for years, filling enormous numbers of invalid controlled-substance prescriptions.

70.   Walmart knew that many controlled-substance prescriptions it filled were not issued for a legitimate medical purpose or were not issued in the usual course of professional medical practice, or both.

71.   First, Walmart often filled prescriptions written by prescribers that its own pharmacists already had identified as problematic – or even "pill-mill" – prescribers. Pharmacists reported these pill-mill prescribers through "refusal-to-fill" forms and other direct communications that they submitted to Walmart's compliance unit, which operated from the Company's headquarters in Bentonville, Arkansas and oversaw nationwide dispensing operations.

72.   Second, certain prescriptions presented obvious red flags relating to the amount, dose, or combination of drugs prescribed, or the prescribing patterns. These prescriptions were so dangerous, and so indicative of prescription drug abuse or other diversion, that Walmart pharmacists knew the prescriptions had a very high probability of invalidity.

73.   Third, numerous times when one Walmart pharmacist would refuse to fill a prescription due to unresolved red flags, another – presented with the same or

similar red flags – would fill the prescription (or a similar one) for the same patient.

74.     From this red-flag information, which Walmart collected and compiled, Walmart's compliance unit learned that Walmart was routinely presented with prescriptions that were not issued for a legitimate medical purpose and/or that were written by prescribers not acting in the usual course of their professional practice. By filling those prescriptions anyway, Walmart violated one or both requirements of 21 C.F.R. § 1306.04(a).

75.     Walmart also violated 21 C.F.R. § 1306.06 because, by filling countless controlled-substance prescriptions despite obvious red flags, Walmart pharmacists failed to comply with their own professional pharmacy practice standards.

76.     These widespread dispensing violations were the inevitable result of Walmart's failure to take seriously its duty to comply with the CSA. Walmart instead pressured its pharmacists to fill prescriptions as quickly as possible, leaving them little time to determine whether prescriptions were valid; kept from its pharmacists the red-flag information it compiled; and deprived its pharmacists of the tools and support they needed to comply with their dispensing obligations.

**Walmart Strong-Armed Pharmacists to Fill Prescriptions Too Quickly**

77.     Retailers like Walmart operate pharmacies primarily to draw customers into their stores with the expectation that those customers will buy other, non-pharmacy goods.  For example, Walmart observed in its fiscal year 2017 annual

report that risks to its pharmacy business could "result in the loss of cross-store or -club selling opportunities and, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity." In another example, Sam's Club at times offered drastic discounts on opioids that helped drive customer traffic to its stores.

78.     To retain customers, Walmart managers repeatedly told pharmacists to fill prescriptions as quickly as possible. For example, a December 17, 2014 email to certain pharmacists stated that "shorter wait times keep patients in store." Other emails urged that if prescriptions were not filled quickly, customers would shop elsewhere.

79.     Even though Walmart pharmacists had legal requirements to satisfy before they could fill controlled-substance prescriptions, Walmart managers told pharmacists to "[h]ustle to the customer, hustle from station to station" because filling prescriptions "is a battle of seconds."

80.     Managers sent the pharmacists data showing the previous day's prescription volumes and wait times, and the managers used this data to create competition among pharmacies. Managers ranked stores for the volumes of prescriptions filled and congratulated pharmacists when the pharmacy dispensed high volumes.

81.     In various emails, Walmart Health and Wellness Directors set a goal

for pharmacists to fill prescriptions in less than 20 minutes—a goal that they later shortened to less than 15 minutes. When pharmacists pointed out the steps required to fill prescriptions, the directors stated that pharmacists still should complete all the necessary procedures in 15 minutes or less.

82.    As early as 2013, Walmart also adopted plans for pharmacies, called Pharmacy Facility Management Incentive Plans, that used the number of prescriptions filled by a pharmacy employee's store as a factor in determining whether the pharmacy employee was entitled to monetary incentive awards.

83.    Walmart conducted surveys of many of its pharmacy employees in June 2012, July 2014, and October 2014. A substantial number of pharmacy employees reported that their pharmacy lacked sufficient staff to handle the workload. For example, in June 2012, only 59% of the employees reported having sufficient staff to handle the workload. By October 2014, only 43% reported having sufficient staff. In both the June 2012 and October 2014 surveys, a substantial proportion of pharmacy employees reported that they felt rushed with processing prescriptions. Many pharmacy employees responded to the surveys with specific written pleas for more staffing and more time to carry out their duties in filling prescriptions. These survey results and the comments were compiled and reviewed at Walmart's Health and Wellness Division.

**Walmart Recognizes its Obligation to Comply with the CSA**

84.     Walmart's pharmacy operations were part of the Company's Health and Wellness Division. The Health and Wellness Division included a compliance team, located at Walmart's headquarters in Bentonville, Arkansas, that was responsible for ensuring that pharmacy operations complied with all relevant federal and state laws. This compliance unit included managers who fielded questions about legal compliance from Walmart's agents in the field, including pharmacists and distribution center staff.

85.     Walmart's pharmacy compliance policies were maintained in a Pharmacy Operations Manual ("**POM**"), which served as a central resource for its pharmacies at both Walmart and Sam's Club stores. In these policies, Walmart acknowledged that it had to comply with important legal requirements when dispensing controlled substances.

86.     In March 2009, Walmart added to its POM a policy ("**POM 1311**") called "Practitioner/Patient Relationship." POM 1311 provided a non-exhaustive list of factors indicating when a proper prescriber-patient relationship may not exist. For example, these factors included prescriptions for large quantities of certain medications or prescriptions with markings suggesting the prescription had been rejected by another pharmacy.

87.     Walmart created an amendment to POM 1311 in or about March 2011

("**POM 1311 (2011)**"), which remained in effect at least through January 2014. POM 1311 (2011) added two more red flags: prescriptions written by an out-of-state prescriber and prescriptions "written by a doctor or for a patient for whom the pharmacy has rejected other prescriptions for a failure to have an appropriate doctor-patient relationship." POM 1311 (2011).

88.     POM 1311 (2011) also recognized that a pharmacist should dispense a controlled-substance prescription only if the pharmacist was able to resolve any red flags, and that the pharmacist should document the resolution of those red flags. Under the policy, if a pharmacist had concerns about a prescription, the pharmacist was permitted to fill the prescription only if the pharmacist "reasonably believe[d]" after speaking with the prescriber that the prescription was valid. In such circumstances, pharmacists were directed to "make a notation on the prescription specifying" the pharmacist's name, the name of the prescriber, the date of the conversation, and the notation "proper relationship verified."

89.     In or about April 2015, as prescription drug abuse continued to escalate throughout the United States, Walmart revised POM 1311 again ("**POM 1311 (2015)**") and specifically addressed pharmacists' obligations with respect to controlled-substance prescriptions, explaining that the CSA imposed a "corresponding responsibility" on pharmacists to dispense controlled-substance prescriptions only if they were written for a legitimate medical purpose and based

on a proper prescriber-patient relationship. POM 1311 (2015) quoted directly from 21 C.F.R. § 1306.04 and explained that this regulation was the basis for nearly all criminal actions taken by the DEA against pharmacies and pharmacists.

90.    POM 1311 (2015) stated that, before a pharmacist filled a controlled-substance prescription with any of these red flags, the red flags "should be evaluated, resolved, and documented." Thus, POM 1311 (2015) shows Walmart's recognition of its obligations under the CSA to identify and resolve any red flags, and document the resolution of those red flags, before filling prescriptions for controlled substances.

**Walmart Commits to Adopting a Compliance Program in 2011 Following Accusations of Dispensing Violations**

91.    In March 2011, the DEA and Walmart entered into a nationwide Administrative Memorandum of Agreement ("**MOA**") to resolve allegations that a California Walmart pharmacy failed to comply with its dispensing obligations when filling controlled-substance prescriptions, including filling prescriptions that Walmart knew or should have known were not issued for a legitimate medical purpose or by a prescriber acting within the usual course of professional practice. The MOA was between the DEA and "Wal-Mart Stores, Inc. on its behalf as well as on behalf of its subsidiaries that operate pharmacies registered with [the] DEA."

92.    The MOA lasted from March 2011 through March 2015. As part of the MOA, Walmart agreed to maintain a national "compliance program, updated as

necessary, designed to detect and prevent diversion of controlled substances as required by the [CSA] and applicable DEA regulations." The compliance program "shall apply to all current and future Walmart pharmacies registered with the DEA" and

> shall include procedures to identify the common signs associated with diversion of controlled substances, including but not limited to, doctor-shopping, requests for early refills, altered or forged prescriptions, prescriptions written by doctors not licensed to practice medicine in the jurisdiction where the patient is located, and prescriptions written for other than a legitimate medical purpose by an individual practitioner acting outside the usual course of his professional practice.

93.    Walmart was also required to institute policies and procedures to block the early refill of controlled substances, maintain and enforce a policy allowing pharmacists to obtain and review patient or doctor profiles from the prescription monitoring program before dispensing controlled substances, implement procedures to routinely verify the validity of DEA registration numbers on prescriptions, implement policies and procedures designed to ensure that pharmacies comply with other applicable laws, and notify the DEA whenever Walmart refuses to fill suspicious prescriptions for controlled substances.

94.    Additionally, the MOA provided that "Walmart acknowledges and agrees that the obligations taken in this subparagraph do not fulfill the totality of its obligations under the CSA and its implementing regulations."

95.    Despite the MOA, in 2016 the DEA raided Walmart for filling

47

suspicious opioid prescriptions of two doctors under investigation who were ultimately convicted of the illegal distribution of opioids. The investigation was broadened to include Walmart's dispensing practices, and it was discovered that between 2011 and 2017, Walmart repeatedly filled suspicious prescriptions for large doses of opioids.

96.    Walmart's own pharmacists from various states raised concerns to Walmart's national compliance department about suspicious opioid prescriptions. In response, one compliance manager stated that Walmart's focus should be on "driving sales." Indeed, Walmart even refused to block the filling of prescriptions for certain doctors suspected of operating pill mills until it was too late. For example, it was reported that Walmart implemented a policy of blocking prescriptions from a certain prescriber, which pharmacists reported to Walmart as writing suspicious prescriptions, only after that prescriber had been indicted.

97.    It has also been reported that Walmart is currently undergoing negotiations for a civil settlement with the DEA to resolve allegations of CSA violations. According to a thoroughly researched March 25, 2020 investigative report in *ProPublica*, Walmart knew about its facilitation of drug diversion for years and did not do anything about it. The article summarized the facts surrounding a federal civil and criminal investigation of Walmart in Texas:

> Opioids dispensed by Walmart pharmacies in Texas had killed customers who had overdosed. The pharmacists who dispensed

48

those opioids had told the company they didn't want to fill the prescriptions because they were coming from doctors who were running pill mills. They pleaded for help and guidance from Walmart's corporate office. Investigators had obtained records of similar cries for help from Walmart pharmacists all over the country: from Maine, North Carolina, Kansas and Washington, and other states. They reported hundreds of thousands of suspicious or inappropriate opioid prescriptions. One Walmart employee warned about a Florida doctor who had a "list of patients from Kentucky that have been visiting pharmacies in all of central Wisconsin recently." That doctor had sent patients to Walmarts in more than 30 other states. In response to these alarms, Walmart compliance officials did not take corporate-wide action to halt the flow of opioids. Instead, they repeatedly admonished pharmacists that they could not cut off any doctor entirely. They could only evaluate each prescription on an individual basis. And they went further. An opioid compliance manager told an executive in an email, gathered during the inquiry and viewed by ProPublica, that Walmart's focus should be on "driving sales."

98.     According to the article, Walmart pharmacists in multiple locations pleaded with the company to allow the pharmacists to stop filling illegitimate prescriptions. The pharmacists told Walmart, for example, "*[w]e are all concerned about our jobs and about filling for a pill mill doctor.*" Another Walmart pharmacist wrote that filling opioid prescriptions for suspicious doctors "is a problem and a liability on us…. Filling for him is a risk that keeps me up at night. This is a serious situation." The pharmacist wrote to headquarters: "*Please help us.*" But according to the *ProPublica* article, "even after more than a decade of soaring addiction and deaths had transformed opioids into a national crisis, Walmart had a policy that pharmacists could conduct no 'blanket refusals' that shut off prescriptions written

by a particular doctor." Moreover, *ProPublica* further reported the MOA remained

secret.

**Walmart Withheld Red Flag Information from its Pharmacists**

99.    As reflected in the *ProPublica* article, Walmart failed to adopt the

robust compliance program it was required to under the MOA. While Walmart

gathered the information from its pharmacists that the MOA required, Walmart

withheld the information from its pharmacists, which crippled their ability to comply

with their legal obligations when dispensing controlled substances.

100.   Walmart maintained, in the ordinary course of business, extensive

prescription and dispensing data relevant to determining whether a prescription

presented red flags. Indeed, Walmart was obligated to maintain data about

dispensing, including the quantities and strengths of controlled substances

dispensed. *See* 21 C.F.R. § 1304.22(c).

101.   In addition, Walmart's compliance unit received reports submitted by

Walmart pharmacists about problematic prescribers or patients. These reports

contained information such as the name of the prescriber and patient, the prescriber's

address and DEA registration number, the controlled substances that had been

refused, and the reasons for the refusal. These reports often included, for example,

alarming details about pill-mill prescribers whose prescriptions had been refused.

102.   Pharmacists emailed the completed refusal-to-fill forms to Walmart's

50

compliance unit. The emails went to a central email address, which was monitored by a senior compliance manager in the Health and Wellness Division.

103.   From 2011 to 2015, during the period when Walmart was under the MOA with the DEA and had committed to report refusals to fill, Walmart's compliance unit gathered into a spreadsheet the information it received from the refusal-to-fill forms. Walmart provided some of this information to the DEA, though it did so after removing comments from the refusal-to-fill forms, which meant that the DEA generally did not see why the pharmacists had refused to fill a prescription.

104.   But for years, Walmart chose not to alert pharmacists to this significant volume of red-flag information associated with many of the prescriptions they were being asked to fill.

105.   Walmart pharmacists knew that Walmart did not have a system to alert them to the red flags reported for particular prescribers or patients. And the extremely tight time pressures Walmart placed on pharmacists to fill prescriptions made it impractical, if not impossible, for Walmart pharmacists to track down red-flag information by contacting Walmart's compliance unit before filling a prescription.

106.   Walmart's compliance unit also recognized that its system was not delivering the information about red flags that the pharmacists needed. In 2013, a Walmart "Controlled Substances Work Group" reported that it needed to "[e]stablish

a process for the analysis of refusal to fill data and reporting problematic prescribers or patients internally." Also in 2013, Walmart's compliance unit established a "Success Measure" that it would "[d]eliver a process for reporting prescribers or patients internally." The Controlled Substances Work Group recognized that, to accomplish this goal, it would need to "[d]etermine how to disseminate refusal to fill decisions and/or problematic prescribers and patients within the same trade area or to the entire corporate entity."

107.   Even though Walmart had committed, under the 2011 MOA with the DEA, to "maintain a compliance program, updated as necessary, designed to detect and prevent diversion of controlled substances," Walmart chose for years not to analyze the red-flag information it collected or to develop a system to disseminate this information to its pharmacists.

108.   Instead, Walmart decided to focus on sales by getting customers in the door. In 2015, a compliance director told a vice president in Health and Wellness Operations that during the MOA, the compliance unit had "not invested a great amount of effort" in data analysis. He explained that "[d]riving sales and patient awareness" was "a far better use of our Market Directors and Market Manager's time." Indeed, before 2015, Walmart pharmacists could not even search for refusal-to-fill forms submitted by other Walmart pharmacists. The only way a Walmart pharmacist could know that another Walmart pharmacist had identified a problem

prescriber or patient was through word of mouth or by proactively contacting the compliance unit and requesting specific information.

109. Finally, in approximately 2015, Walmart introduced a new platform for pharmacy compliance known as "Archer." Although Archer allowed pharmacists to search for refusal-to-fill forms submitted by other pharmacists for specific prescribers or patients, it did not affirmatively alert pharmacists to red-flag information.

110. For most of the period from when it entered into the MOA in March 2011 through the present (the "**Relevant Period**"), Walmart's compliance unit generally did nothing to resolve the red flags that had been reported. And by not following up, Walmart often avoided obtaining readily available information that would have corroborated, rather than resolved, the red flags. For example, Walmart often failed to retrieve relevant information that was accessible from state databases for prescription drug monitoring, from the public records of state medical licensing boards, or from public criminal records. It also often failed to contact other pharmacies that had decided not to fill prescriptions for a prescriber. In fact, according to some pharmacists, Walmart's compliance unit often did not even take the most basic step of speaking with the pharmacist who had refused to fill the prescription.

111. Accordingly, throughout the Relevant Period, Walmart's compliance

unit gathered, through refusal-to-fill forms and other communications, a large volume of red-flag information about numerous high-risk prescribers and patients. But Walmart elected not to take any steps to ensure that its pharmacists received this critical red-flag information, which they needed in order to comply with their legal obligations under the CSA when dispensing controlled substances.

**Walmart Prohibited Pharmacists from Making Blanket Refusals to Pill Mills**

112.   Even when pharmacists determined that prescribers were acting as pill mills, Walmart's compliance unit refused to let the pharmacists categorically refuse to fill those prescriptions. Rather, the compliance unit told pharmacists that they needed to consider each individual prescription—an approach that made it impractical for pharmacists to reject all prescriptions issued by these pill-mill prescribers, particularly given the strict time pressures Walmart imposed on its pharmacists.

113.   Walmart's POM 1311 (2011) confirmed Walmart's prohibition on blanket refusals to fill by pharmacists. It stated: "Blanket refusals of prescriptions are not allowed. A pharmacist must make an individual assessment of each prescription and determine that it was not based on a valid prescriber-patient relationship or for a valid medical reason before refusing to fill."

114.   Walmart's compliance unit also often advised pharmacists that "no blanket refusals are allowed by the Boards of Pharmacy," but – as Walmart's

compliance unit knew – this sweeping statement was unsupported. In early 2014, the compliance unit acknowledged its uncertainty when it designated the need "to determine if pharmacists may exercise their discretion to impose blanket refusals" as a "Key Deliverable" it needed to accomplish. Eventually, blanket refusals were permitted.

115.  For years, however, Walmart's instructions effectively led its pharmacists to continue to fill prescriptions issued by prescribers whom those Walmart pharmacists had reported as "pill-mill" prescribers because the alternative—filling out an individual refusal-to-fill form for every prescription issued by a pill-mill prescriber—would create an overwhelming amount of paperwork.

116.  The approach taken by Walmart – pressuring pharmacists to fill high volumes of prescriptions very quickly, while at the same time withholding from those pharmacists the red-flag information and support they needed to fulfill their gatekeeping duties – resulted in thousands of violations of Walmart's dispensing obligations all across the country.

**<u>Walmart Systematically Filled Prescriptions With Glaring Red Flags</u>**

117.  Walmart dispensed thousands of controlled-substance prescriptions that exhibited obvious red flags – including the dose or amount prescribed, combination of drugs, or prescribing pattern – that Walmart pharmacists would have

recognized as indicating a high probability that the prescriptions were invalid. But Walmart pharmacists often filled the prescriptions anyway. Walmart's compliance unit found repeatedly that Walmart pharmacists had filled prescriptions with obvious red flags without resolving the red flags or submitting any documentation.

118.   As trained pharmacists know, and as Walmart recognized in POM 1311 (2015), prescriptions can show obvious red flags on their face when they are "presented in a combination that can cause medical complications." Such combinations can include prescriptions for (i) multiple immediate-release opioids; (ii) an immediate release opioid and methadone, a longer acting opioid; or (iii) dangerous combinations of opioids with non-opioids such as benzodiazepines, muscle-relaxers, sedatives such as zolpidem (Ambien), or stimulants.

119.   Despite the well-known dangers presented by such combinations, and the fact that they are overwhelmingly used for abuse, Walmart pharmacists filled thousands of prescriptions for dangerous combinations of opioids with other controlled substances in all of these categories during the Relevant Period, often without clearing red flags or submitting any documentation.

120.   As trained pharmacists also know, and as Walmart recognized in POM 1311 (2015), certain prescriptions presented red flags if they were "for an unusually large quantity or high starting dose." Walmart pharmacists often reported in refusal-to-fill forms that prescriptions for high dosages were a red flag, yet many Walmart

pharmacists continued to fill such prescriptions.

121.   Similarly, when someone asks to refill a controlled-substance prescription significantly early, it raises a red flag regarding abuse or other diversion because it suggests that he or she is either taking a higher quantity than prescribed or diverting at least some of the pills to others.

122.   Walmart repeatedly filled prescriptions for Schedule II controlled substances significantly early, well before the patient should have exhausted the previously dispensed supply from an earlier prescription. Many prescriptions were filled so early that Walmart pharmacists would have known that substantially all of them were illegitimate.

123.   Finally, on many occasions, Walmart pharmacists filled a controlled-substance prescription that showed red flags, where the same or a similar prescription for the same patient had been rejected by another Walmart pharmacist. In other words, even when one or more Walmart pharmacists had recognized that obvious red flags made a prescription invalid, another Walmart pharmacist filled the prescription or a similar one.

124.   In sum, in the various ways outlined above, Walmart dispensed thousands upon thousands of prescriptions that its pharmacists likely knew were invalid (or had a very high probability of being invalid), and, by filling these controlled-substance prescriptions despite the red flags, it also failed to comply with

the usual course of professional pharmacist practice. Each time it did so, it violated its dispensing obligations under 21 C.F.R. § 1306.04(a) and § 1306.06.

## WALMART'S DISTRIBUTION OF OPIOIDS VIOLATED THE CSA

125.   Walmart acted as its own distributor from 2000 to approximately May 2018 (the "**Distribution Period**"), shipping tens of millions of shipments of controlled substances to its 5,000 pharmacies.

126.   Indeed, during the period from 2012 to 2018, Walmart was the largest self-distributor for oxycodone, hydromorphone, and hydrocodone in the United States in terms of both dosage units and grams.

127.   As a distributor, Walmart was required by law to design and operate a system to detect suspicious orders of controlled substances, and to report those orders to the DEA. *See* 21 C.F.R. § 1301.74(b). Suspicious orders "include" orders that are unusual in size, pattern, or frequency, but are not limited to only those three categories. *Id.*

128.   Walmart failed to comply with its obligation under 21 C.F.R. § 1301.74(b). It did not design and operate a system to detect suspicious orders, and did not report at least hundreds of thousands of suspicious orders to the DEA.

129.   Because Walmart acted as its own distributor, it had access to extensive data and other information that independent distributors would not ordinarily have.

130.   In particular, Walmart had a wealth of dispensing information that gave

it the ability to investigate the circumstances underlying orders for controlled substances. Walmart had data about individuals who filled controlled-substance prescriptions at its pharmacies, the identities of the medical providers who were prescribing controlled substances for those individuals, and reports from its own pharmacists raising concerns.

131.    Walmart had access to additional data and other information that it could have used to inform its decision as to whether an order was suspicious or not, including but not limited to:

a.    instances in which a pharmacist had refused to fill prescriptions written by particular prescribers;

b.    knowledge of "pill mill" prescribers whose patients filled prescriptions at Walmart pharmacies and the specific controlled substances that they often unlawfully prescribed to patients;

c.    knowledge of Walmart's own pharmacists, pharmacy managers, and market directors;

d.    the distance between prescribers, patients, and pharmacies;

e.    information concerning patients who paid cash for controlled substance prescriptions;

f.    drug diversion trends; and

g.    previous DEA Form 106 (Theft and Loss) filings.

132.   Walmart also had access to distribution-related data and other information, including but not limited to:

a.     the number of bottles of controlled substances that each of its pharmacies had already ordered in any given week;

b.     historical order quantities and patterns;

c.     order and shipment history for orders that Walmart pharmacies placed with independent distributors (*e.g.,* McKesson Corporation and AmerisourceBergen Corporation), including reports warning when a pharmacy was nearing an independent distributor's threshold and information about instances when an independent distributor had refused to ship the order and reported the order to the DEA as suspicious;

d.     orders that had been previously flagged for its pharmacies;

e.     analytics concerning each pharmacy's ratio of controlled-substance purchases to non-controlled-substance purchases;

f.     previous suspicious-order reports for its pharmacies; and

g.     prior and current suspicious order monitoring ("**SOM**") remediation plans, discussed below, for its pharmacies.

133.   As a vertically integrated distributor and dispenser of prescription opioids, Walmart had the capability to use sophisticated data analytics to enhance and optimize its pharmacy operations. Walmart has emphasized that it relies on "big

data" in its pharmacy operations to "enhance, customize and optimize the shopping experience" and "to make Walmart pharmacies more efficient," namely by using the data to "help[] the pharmacy with staff scheduling and to reduce the amount of time it takes a prescription to be filled."[2]

134.   Indeed, the allegations in the federal multidistrict opioid litigation consolidated before the Northern District of Ohio – *In Re: Nat'l Prescription Opiate Litig.*, Case No. 17-02804 (N.D. Ohio) (the "**MDL**") – discuss the glaring disparity between the population of a number of West Virginia counties and the size and volume of prescriptions filled by area Walmart pharmacies. All of this data was available to Walmart, and yet it did nothing.

135.   As just one example, the population of Cabell County, WV was approximately 91,000 in the years 2007-2012. ████████████████

████████████████████████████████████

██████████████████████████

---

[2] https://corporate.walmart.com/newsroom/innovation/20170807/5-ways-walmart-uses-big-data-to-help-customers



136.   Walmart distributed similarly egregious quantities of opioids throughout the United States as alleged in the MDL. In addition to the data and other information it had about its own vertically integrated distribution and dispensing operation, Walmart also had access to data and other information about the millions of orders shipped to its pharmacies from independent distributors, principally McKesson Corporation ("**McKesson**") and AmerisourceBergen Corp. ("**AmerisourceBergen**"). Although Walmart had the ability to use all this data and other information to detect suspicious orders, it chose not to do so.

137.   Walmart's SOM program contained significant defects during the Distribution Period that prevented Walmart from detecting and reporting at least hundreds of thousands of suspicious orders that its pharmacies placed with its distribution centers. Although Walmart's SOM went through a number of iterations during the Distribution Period, the changes were insufficient to fix the known defects and meet Walmart's legal obligation under 21 C.F.R. § 1301.74(b) to detect and

report suspicious orders.

**Walmart's Rudimentary SOM Prior to August 2015 Failed to Adequately Detect and Report Suspicious Orders**

138.    From 1996 to 2010, Walmart used employees at its distribution centers to review orders for controlled substances, speak to pharmacies about the orders, and escalate any order needing further review. However, Walmart had no written criteria regarding how to identify orders that needed further review. Walmart simply relied on the experience of hourly associates reviewing hundreds of orders each day to recall what an unusual order would be for one of Walmart's 5,000 pharmacies. Under this system, few, if any, orders were ever identified by distribution center employees as needing further review or otherwise followed up on.

139.    Walmart's policies during this time period failed to identify suspicious orders before shipment (or at any other time) and, as a consequence, Walmart routinely shipped suspicious orders. Walmart failed to use available reports and information to monitor for suspicious orders. Walmart further did not have a process to monitor or keep track of any order that was flagged.

140.    On or about December 27, 2007, the DEA sent letters to all registered distributors of controlled substances, including Walmart, reminding them of their legal obligation under 21 C.F.R. § 1301.74(b) to detect and report suspicious orders to the DEA.

141.    In the December 27, 2007 letter, the DEA advised distributors including

Walmart that failing to comply with their obligations could lead to great harm:

> [A]ll registrants—manufacturers, distributors, pharmacies, and practitioners—share responsibility for maintaining appropriate safeguards against diversion. Nonetheless, given the extent of prescription drug abuse in the United States, along with the dangerous and potentially lethal consequences of such abuse, even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm.

142. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

143. Despite these recordkeeping failures, which should have put the Company on notice, Walmart had no written policies or procedures related to the identification or reporting of suspicious orders before November 2010.

144. In November 2010, Walmart adopted Pharmacy Manual 21-402 ("Controlled Substance Monitoring") ("**Pharmacy Manual 21-402 (November 2010)**").

145. This policy simply required certain Walmart employees to review a monthly report, known as a "control drug stock exception report," after the controlled substances had been shipped to the pharmacies and identify any controlled substances that constituted more than 3.99% of a pharmacy's total controlled and non-controlled-substance purchases during the prior month.

146. Under Pharmacy Manual 21-402 (November 2010), Walmart failed to

detect many unusual orders. First, the monthly reports did not identify specific controlled-substance orders that were unusually large. Instead, the reports aggregated all shipments of particular controlled substances and then compared those aggregated totals to see if they exceeded 3.99% of a pharmacy's total shipments that month. As a result, many unusually large orders were not flagged because they were subsumed in the aggregated totals. Second, the policy did not require Walmart to flag any orders that were otherwise suspicious (*e.g.*, exhibiting an unusual frequency or unusual pattern). Pharmacy Manual 21-402 (November 2010) did not describe these aggregated totals as "suspicious orders" or even state that Walmart was required to detect and report suspicious orders to the DEA.

147.   In or around 2011, Walmart implemented order alerts in an inventory management system called "Reddwerks." These alerts flagged orders for controlled substances of 50 bottles or more and orders for amounts 30% higher than a rolling 4-week average for that item. However, Walmart used a minimum 10-bottle-a-week threshold for this criterion so that even if an order was 30% higher than a rolling 4-week average, it was not flagged if the order for that particular product was less than 10 bottles per week.

148.   Starting in July 2012, Walmart placed a hard limit of 20 bottles of oxycodone 30 mg, and internally circulated a report listing orders for Schedule II controlled substances of more than 20 bottles for further review and follow-up as

needed. Little if any due diligence on these orders was conducted.

149.   Instead, Walmart automatically cut to 20 bottles and shipped—without further review—any order for more than 20 bottles. While Walmart put at least some of these orders for more than 20 bottles on a list for potential follow up, the orders were still reduced to 20 bottles and shipped.

150.   By mid-2014, Walmart recognized that the Company was at risk of enforcement from the DEA because it was failing to detect and report suspicious orders as required by 21 C.F.R. § 1301.74(b). Walmart's publicly-disclosed e-mails acknowledge that Walmart considered modifying its SOM system "to help Walmart avoid DEA enforcement as a result of non-compliance with 21 CFR 1301.74(b)." Walmart's publicly-disclosed e-mails further acknowledge that its SOM system was an "existing risk" and "emerging risk" for which it had "no processes in place." Walmart's own assessment was that the risk that its pharmacies would place suspicious orders with its own distribution centers was "likely," the second-highest of five levels on Walmart's scale of likelihood of risks.

151.   In July 2014, Walmart revised Pharmacy Manual 21-402 and renamed the policy "Evaluating Orders of Interest and Suspicious Order Reporting" ("**Pharmacy Manual 21-402 (July 2014)**").

152.   Unlike the 2010 version, Pharmacy Manual 21-402 (July 2014) instructed compliance unit personnel to evaluate individual orders as they were

placed – rather than monthly aggregated totals after Walmart's distribution centers had already shipped the controlled substances – and report any suspicious orders to the DEA.

153. Pharmacy Manual 21-402 (July 2014) called for Walmart first to identify "orders of interest" from among all controlled-substance orders, and then to investigate those "orders of interest" to determine whether they were indeed "suspicious orders" subject to reporting to the DEA. But both steps of this system failed.

154. The criteria Walmart adopted for flagging "orders of interest" in the first instance were plainly inadequate, allowing many suspicious orders to evade any scrutiny. Walmart routinely failed to investigate orders that were flagged as "orders of interest" to ascertain whether they were suspicious, prioritizing expeditious distribution of controlled substances to meet its pharmacies' and pharmacists' demands over compliance with DEA regulations.

**Walmart Failed to Detect and Report Orders of Unusual Frequency or Pattern**

155. Pharmacy Manual 21-402 (July 2014) states that Walmart must evaluate orders with "[u]nusual characteristics," which it defined to include orders showing "unusual size," "unusual frequency," and "unusual pattern."

156. Despite the requirements in 21 C.F.R. § 1301.74(b) and in Walmart's own SOM policy to detect and report orders showing "unusual frequency" and

"unusual pattern," Walmart's SOM system focused exclusively on the size of orders. It contained no processes to detect or report orders with unusual frequency or unusual pattern.

157.   During the Distribution Period, most of Walmart's six distribution centers used Reddwerks as their order fulfillment system. Reddwerks tracked orders placed by Walmart pharmacies, as well as shipments from Walmart distribution centers back to the pharmacies in fulfillment of those orders. Although Reddwerks was not designed for monitoring suspicious orders, Walmart nevertheless used it for that purpose. Specifically, Walmart used Reddwerks to set "order alerts" – also known as "thresholds" – that would flag only orders over a certain quantity.

158.   Walmart had many opportunities to design a system that would have detected unusual ordering patterns. As early as February 2014, Mu Sigma, an outside consultant that advised Walmart about the development of its SOM program, informed Walmart that it could revise that program to detect Walmart pharmacies' unusual ordering patterns and combinations, which could indicate that a particular Walmart pharmacy was dispensing dangerous drug "cocktails."

159.   Despite this offer from Mu Sigma, Walmart did not revise its SOM program in that way or any other way to detect unusual, dangerous patterns during the Distribution Period.

160.   Walmart knew that its SOM system was deficient in that it ignored

pattern and frequency, in violation of the law. In a publicly-disclosed internal presentation from October 2014, just a few months after the July 2014 SOM policy had been put in place, Walmart recognized that Reddwerks "[f]lags only identify 'unusual size.'" That deficiency remained uncorrected for years.

161.   Because Walmart's system was not designed to flag orders for unusual frequency and unusual pattern, Walmart did not report any of these orders to the DEA, in violation of the law.

**Walmart Failed to Adequately Detect and Report Unusually Large Orders**

162.   Despite Walmart's sole focus on order size, its monitoring still failed to detect significant numbers of orders of "unusual size."

163.   Sometime prior to the adoption of Pharmacy Manual 21-402 (July 2014), Walmart's SOM program began using weekly size "thresholds" and "hard limits" for the quantity of controlled substances that each of its pharmacies could order from the six Walmart distribution centers.

164.   An order that hit a "threshold" was supposed to trigger a temporary "hold" of that order for further evaluation.

165.   A "hard limit" nominally served as the maximum amount that a pharmacy could order of a particular drug. But Walmart sometimes ignored its own hard limits, allowing its pharmacies to order and receive quantities greater than the hard limit.

166.    Moreover, the thresholds and hard limits ignored significant differences between pharmacies. Walmart knew that its pharmacies varied significantly in many respects. For instance, some served sparsely populated rural communities, while others served suburban or urban communities with larger populations. Likewise, depending on location, Walmart pharmacies might face differing levels of competition from other retail chain pharmacies or independent pharmacies. Customer characteristics also differed in material ways, such as age and diagnoses, which affected the types and amounts of controlled substances each pharmacy needed to stock and dispense to meet customer demand.

167.    Despite knowing of these variations among pharmacies, Walmart applied the same numeric thresholds to each of its pharmacies and did not tailor its order-size thresholds. Regardless of the attributes of the pharmacy placing an order – whether it was in a sparsely populated rural area, or a densely populated suburb – Walmart's SOM system uniformly flagged the following weekly order totals:

      a.  Schedule II controlled substances exceeding 20 bottles;

      b.  Schedule III-V controlled substances exceeding 50 bottles; and

      c.  30% above four-week average (if 11 bottles or greater).

168.    In a publicly-disclosed document titled "Overview of SOM Project Progress," attached to a November 23, 2014 email from a senior manager of logistics to other compliance unit personnel, Walmart acknowledged that thresholds for its

pharmacies were set "regardless of store history."

169.   In addition, Walmart had no supporting rationale for its decision to set a 50-bottle threshold for Schedule III, IV, and V controlled substances. The "Overview of SOM Project Progress" stated that Walmart lacked any documentation showing why 50 bottles had been selected as a threshold for certain controlled substances.

170.   This arbitrary, one-one-size-fits-all threshold meant that a pharmacy could order the same amount – up to 50 bottles – of a highly addictive Schedule III narcotic as it could order of a Schedule V controlled substance with a lower potential for abuse.

171.   As a result of Walmart's one-size-fits-all approach in setting thresholds and hard limits, Walmart failed to detect and report many unusually large orders.

**Walmart Routinely Shipped Orders Exceeding its Hard Limit for Oxycodone**

172.   Starting in or about July 2012, Walmart implemented a "hard limit" of 20 bottles of oxycodone 30mg per week, per pharmacy.

173.   Oxycodone 30mg was the only controlled substance and only dosage strength for which Walmart imposed a "hard limit" on the number of bottles its pharmacies could order each week.

174.   Despite this singular focus on this one drug formulation, Walmart frequently disregarded its own 20-bottle "hard limit" for oxycodone 30mg, a highly

addictive Schedule II narcotic opioid.

175.   Between June 2013 and July 2015, on at least 216 separate occasions, Walmart shipped to its pharmacies more than 20 bottles of oxycodone 30mg in one week.

176.   This problem was concentrated in a handful of pharmacies. Approximately half of the instances where Walmart disregarded its own hard limit of 20 bottles of oxycodone 30mg went to only six pharmacies: Store 5350 in Salt Lake City, Utah; Store 1560 in Las Vegas, Nevada; Store 5697 in Milwaukee, Wisconsin; Store 2708 in Temecula, California; Store 130 in Muskogee, Oklahoma; and Store 5047 in Audubon, New Jersey.

177.   For example, during a 12-week period in 2015, Store 130 in Muskogee, Oklahoma, received more than 20 bottles of oxycodone 30mg in 11 of those weeks, for a total of 248 bottles. These suspiciously large orders of oxycodone 30mg and Walmart's failure to report them to the DEA are particularly egregious because the pharmacists in that store suspected that patients from a local pill-mill practice in Muskogee were routinely using Store 130 to fill unlawful prescriptions. Walmart pharmacists at Store 130 had reported to Walmart compliance personnel that "there is a significant drug abuse problem in town" and that "many" patients of the doctor at issue "don't take [their prescribed] meds, they sell them – sometimes before they even leave the store."

178.   For another example, over a 14-week period in 2014, Walmart repeatedly shipped well over 20 bottles of oxycodone 30mg to Store 5350 in Salt Lake City, Utah. Walmart ultimately shipped a total of 399 bottles to this pharmacy over these 14 weeks. Moreover, during the broader time period of June 2013 through July 2015, on 41 separate occasions, Walmart sent weekly shipments totaling more than 20 bottles of oxycodone 30mg to Store 5350.

179.   Despite repeatedly violating its own hard limit, Walmart did not report to the DEA as suspicious any of the orders resulting in the shipments identified above.

**Walmart's Size Thresholds Did Not Consider the Number of Doses**

180.   Prior to August 2015, Walmart's size thresholds were based on the number of bottles, rather than on the number of dosage units included in each bottle.

181.   In a publicly-disclosed "Overview of SOM Project Progress," Walmart recognized this deficiency, noting that "[m]onitoring level = 50 bottles (regardless of store history, **bottle size**, etc) or order amount >30% over rolling 4 week average."

182.   Because of this flaw, pharmacies could evade the bottle-based thresholds, obtaining more dosage units of controlled substances without scrutiny by ordering bottles containing more pills.

183.   For example, in two shipments on December 12 and 13, 2013, Store 7259 in Georgetown, Kentucky, received a total of 10 bottles of oxycodone

hydrochloride-acetaminophen 5/325mg, each containing 500 pills. Store 7259 thus received 5,000 dosage units in one week. Store 7259 could have obtained the same number of dosage units by ordering bottles containing only 100 pills per bottle, but then it would have ordered 50 bottles and exceeded the 20-bottle threshold. Instead, Store 7259 was able to receive 2.5 times as many pills while evading scrutiny—and potential reporting to the DEA as a suspicious order—because it stayed below the 20-bottle threshold simply by ordering a larger bottle size.

184.   In another instance, on February 26 and 27, 2014, Store 2156 in Middle Island, New York, received a total of nine bottles of oxycodone hydrochloride-acetaminophen 5/325mg, each containing 500 pills. Store 2156 thus received 4,500 dosage units in one week. If Store 2156 had ordered bottles containing only 100 pills per bottle, the pharmacy would have had to order 45 bottles to obtain the equivalent dosage units, which would have exceeded the 20-bottle threshold for evaluation of Schedule II controlled-substance orders. Instead, Store 2156 was able to receive over two times as many pills while evading scrutiny—and potential reporting to the DEA as a suspicious order—because it stayed below the 20-bottle threshold simply by ordering a larger bottle size.

185.   Throughout this period, Walmart knew that setting thresholds based on bottle quantity rather than dosage-unit quantity presented a glaring loophole for pharmacies to order excessive amounts of controlled substances.

186.   Although Walmart recognized as early as October 2013 that relying on order-size thresholds based on the number of bottles presented problems, Walmart delayed fixing this problem and did not implement order-size thresholds based on the number of dosage units until at least August 2015.

## Walmart's Size Thresholds Were Ineffective at Detecting Unusually Large Orders

187.   Another flaw in Walmart's size thresholds was that Walmart's SOM program did not aggregate and flag multiple orders placed by a pharmacy for the same drug and strength if those orders were for products that had different National Drug Codes[3] because they were made by different manufacturers.

188.   For example, in 2014, a Walmart distribution center shipped Store 5350 in Salt Lake City, Utah several orders of oxycodone 30mg that were unusual when aggregated. Over the course of one week, from November 25-28, 2014, Store 5350 received 16 bottles of oxycodone 30mg (NDC 10702000901) and 19 bottles of oxycodone 30mg (NDC 228287911), but neither weekly shipment total—based on NDC alone—was flagged as exceeding 20 bottles. Each order exceeding the weekly hard limit of 20 bottles of oxycodone 30mg should have been flagged and reported to the DEA as suspicious, but Store 5350 evaded the 20-bottle hard limit because the NDCs differed, allowing Store 5350 to receive 35 bottles of oxycodone 30mg in one

---

[3] A National Drug Code ("**NDC**") is a unique, three-segment number that serves as universal product identifier for drugs.

week, almost twice the hard limit because of this loophole.

189.  In another example, Store 2837 in Las Vegas, Nevada, received shipments of 12 bottles of oxycodone 30mg (NDC 10702000901) and 18 bottles of oxycodone 30mg (NDC 228287911) on January 8, 2014. This weekly total of 30 bottles of oxycodone 30mg exceeded the 20-bottle hard limit, but was not flagged and reported to the DEA as suspicious because Walmart failed to monitor for differing NDCs for the same drug strength.

190.  Walmart's failure to close this NDC loophole enabled the oxycodone 30mg hard limit of 20 bottles to be exceeded at least 146 times between June 2013 and July 2015.

191.  This problem of not evaluating the orders in the aggregate was not limited to orders of oxycodone 30mg, but extended to other Schedule II controlled substances. Because Walmart did not monitor Schedule II orders of the same drug and strength with different NDCs, Walmart's SOM system failed to flag at least 1,500 weekly shipments of other Schedule II controlled substances with a combined weekly total above 20 bottles for further evaluation.

**Walmart "Cut" Unusual Orders and Failed to Report them to the DEA**

192.  Walmart also avoided reporting suspicious orders by "cutting," *i.e.,* reducing the size of orders that would otherwise raise concerns, down to a size Walmart considered acceptable. Specifically, when Walmart received an order from

76

one of its pharmacies above the threshold of 20 bottles for a Schedule II controlled substance, or 50 bottles for a Schedule III, IV or V controlled substance, Walmart often "cut" that order down to 20 or 50 bottles.

193.   For instance, on October 16, 2014, an Operations Manager at a Walmart distribution center circulated a report to other Walmart compliance personnel showing several orders greater than 50 bottles that had been "cut" down to 50 bottles and shipped out to pharmacies the prior day:

| Date | Store | NDC | Description | Item Pack Quantity | Ordered | Sent |
|------|-------|-----|-------------|-------------------|---------|------|
| 10/15/2014 | 1783 | 603388721 | HYD/BIT/ACET 10/325 | 100 | 63 | 50 |
| 10/15/2014 | 5133 | 406012501 | HYDRO/APAP 10/325MG | 100 | 82 | 50 |
| 10/15/2014 | 1575 | 406012501 | HYDRO/APAP 10/325MG | 100 | 76 | 50 |
| 10/15/2014 | 1951 | 406012501 | HYDRO/APAP 10/325MG | 100 | 63 | 50 |

194.   Walmart did not send the DEA a suspicious-order report for any of the cut orders listed above.

195.   After Walmart set the 20-bottle hard limit for oxycodone 30mg orders in or about July 2012, the company's policy was that oxycodone 30mg orders exceeding the 20-bottle weekly limit were to be flagged and "cut" down so that the pharmacy would receive no more than 20 bottles.

196.   In an October 14, 2013 email, an Operations Manager at the only Walmart distribution center that distributed oxycodone 30mg, wrote that Walmart had a "standing" cut for oxycodone 30mg and that "[a]ny order over 20 bottles of this item is cut back to 20 bottles."

197.   Although Walmart cut these orders and shipped the reduced (but still substantial) quantities of controlled substances to its pharmacies, Walmart did not report these unusually large orders to the DEA.

198.   Walmart's practice of cutting these unusually large orders and shipping the reduced portion without reporting the original large orders to the DEA disguised the large quantities that its pharmacies repeatedly ordered.

199.   Worse still, Walmart knew that its practice of shipping "cut" orders violated DEA regulations.

200.   Indeed, in a February 2015 meeting, DEA diversion investigators explicitly informed Walmart that its practice of receiving an order, reducing the quantity of the order, and shipping that reduced quantity without reporting the order as suspicious to the DEA violated 21 C.F.R. § 1301.74(b).

201.   Despite this knowledge, Walmart continued to unlawfully cut and ship orders without reporting them to the DEA through at least November 29, 2017.

**Walmart Did Not Count Shipments From Other Distributors in its Pharmacy Thresholds**

202.   Walmart also recognized that the SOM program had an additional, critical shortcoming: Walmart-branded pharmacies and Sam's Club-branded pharmacies ordered and received at least hundreds of thousands of shipments of controlled substances from McKesson and AmerisourceBergen, respectively, but Walmart did not factor in these shipments from independent distributors when

considering whether the pharmacies had exceeded order-size thresholds and hard limits.

203.   McKesson, as a back-up supplier for Walmart-branded pharmacies, shipped at least hundreds of thousands of controlled-substance orders to Walmart-branded pharmacies from June 2013 through July 2015.

204.   AmerisourceBergen was the primary distributor for Sam's Club-branded pharmacies, and Walmart was a back-up supplier. As the primary distributor, AmerisourceBergen shipped at least hundreds of thousands of controlled-substance orders to Sam's Club-branded pharmacies from June 2013 through July 2015.

205.   For Schedule II controlled substances, Walmart required its pharmacies to place all orders through one of its distribution centers – even orders that would ultimately be fulfilled by independent distributors when the distribution center was out of stock or did not carry a particular Schedule II controlled substance.

206.   Schedule III, IV, and V controlled substances, however, were handled differently. For Schedule III, IV, and V controlled substances, sometimes pharmacies placed orders directly with independent distributors rather than channeling all orders through a Walmart distribution center first.

207.   There were two problems with how Walmart's SOM system accounted for orders from independent distributors.

208.   First, even when Walmart knew that the independent distributor would ultimately fulfill an order, and thereby push the pharmacy's weekly order total above Walmart's order-size thresholds (*e.g.,* 20 bottles, 50 bottles, or 30% above the four-week average), Walmart passed the order along to the independent distributor for fulfillment without evaluating whether the order was suspicious. Had Walmart been abiding by its legal obligation to detect and report suspicious orders, Walmart would have reported that order to the DEA.

209.   Because of this system failure and other failures to monitor orders with independent distributors, between June 2013 and July 2015, Walmart unlawfully failed to detect and report to the DEA thousands of its pharmacies' unusually large orders.

210.   Second, Walmart's compliance personnel did not even know of some orders fulfilled by independent distributors because Walmart pharmacies could bypass Walmart distribution centers altogether and order directly from independent distributors. Walmart's SOM system did not identify these orders, leaving Walmart's compliance unit in the dark about the quantity of Schedule III, IV, and V controlled substances ordered from independent distributors. Because Walmart did not identify these orders, it of course did not evaluate them.

211.   Walmart recognized that its SOM system had this blind spot. In a publicly-disclosed October 2014 internal presentation assessing the efficacy of its

SOM system, Walmart noted that "McKesson orders are not considered in evaluation." Likewise, the "Overview of SOM Project Progress" attached to a November 23, 2014 email stated that Walmart had "[n]o process for including McKesson orders in evaluation."

## Walmart Characterized Unusually Large Orders as "Errors" to Avoid Reporting Them as Suspicious

212.   Walmart made up other reasons for not reporting unusually large orders to the DEA. In particular, Walmart began classifying unusually large orders as "errors" in order to justify rejecting the order or reducing the size of the order, even when there was no basis for thinking the pharmacies had intended to order a smaller quantity.

213.   In a publicly disclosed email dated August 27, 2014, a Walmart Senior Manager for Logistics advised that "'[c]utting' an order should **only** be an option if the order is an error (eg store intended to order 10 bottles, ordered 100)."

214.   Although Walmart was aware that it should limit "cutting" orders to true "errors," it stretched the meaning of "error" so broadly that it would conceal all sorts of suspicious activity.

215.   In an internal email dated November 5, 2014, concerning the use of "error" as a reason code for cutting orders, an Operations Manager for a Walmart distribution center wrote: "Many things could be considered an 'error' other than just mis-keying an order. Such as, due to the change of Hydro to a CII some

pharmacist[s] feel the need to stock up. The company feels 50 bottles is enough and pharmacist shouldn't stock up, thus an error in decision making. And many other reasons not confined to mis- keying." (On October 6, 2014, hydrocodone was reclassified from a Schedule III controlled substance to a Schedule II controlled substance, which reflected the DEA's concern regarding the abuse and diversion potential of hydrocodone.)

216.   Walmart thus expanded its definition of "error" beyond its pharmacies' unintentional mistakes to include their deliberate placement of unusually large orders. This overly expansive definition of "error" caused Walmart to fail to report suspicious orders to the DEA.

## Walmart Ignored Red Flags of Diversion from its own Pharmacies

217.   In addition to altogether failing to detect orders of unusual frequency or pattern and failing to adequately detect orders of unusual size, Walmart's SOM program also ignored red flags that diversion was occurring at certain pharmacies.

218.   As noted above, 21 C.F.R. § 1301.74(b) defines suspicious orders as including orders that are suspicious for reasons other than unusual size, unusual frequency, or deviating from the normal pattern, but does not limit the definition to these three categories.

219.   Nevertheless, in addition to ignoring the three categories listed in the regulation, Walmart's compliance unit ignored other warning signs that orders

placed by certain pharmacies were suspicious. These signs included concerns expressed by pharmacists to compliance personnel about prescriptions written by "pill mill" prescribers and illegal diversion occurring inside Walmart stores.

220.   For instance, in a series of emails, the pharmacy manager of Store 147 in Denison, Texas, warned Walmart's compliance unit about a certain Texas prescriber. Despite these concerns, Walmart took no action to limit the shipment of controlled substances to Store 147, which routinely filled prescriptions issued by the prescriber, and failed to notify the DEA of suspicious orders from that store.

221.   Likewise, Walmart received numerous warnings regarding a certain North Carolina prescriber. Over a period of two years, from July 2013 to July 2015, Walmart's compliance unit received more than 70 warnings from pharmacy managers and pharmacists at Walmart pharmacies in North Carolina about the prescriber, including warnings about his practice of prescribing high volumes of Schedule II controlled substances.

222.   Walmart pharmacists submitted more than 70 refusal-to-fill forms that warned that this North Carolina prescriber's prescriptions had no legitimate medical purpose and raised numerous and repeated red flags related to this prescriber, his patients, and the prescriptions he wrote. For example, one refusal- to-fill form by a pharmacist from Store 3825 in Havelock, North Carolina, explained that the prescriber "only writes for large qty [sic] of narcotic medications." The next day,

another pharmacist at Store 3864 in Jacksonville, North Carolina, submitted a refusal-to-fill form about another one of the same prescriber's opioid prescriptions and warned that the prescription was "written by a doctor that is known to give large quantities of c2 [*i.e.,* Schedule II] prescriptions and no other ones." (Emphasis omitted.) Nine months later, a pharmacist at Store 7238 in Grantsboro, North Carolina, reported in a refusal-to-fill form that this same prescriber's patient "appeared intoxicated (slurred speech [sic], unstable, glossy eyes)" and that the "prescription [was] written for [a] large quantity." (Emphasis omitted.)

223. Despite knowing about all of these warnings of diversion from its own pharmacists, Walmart took no action to limit the shipment of controlled substances to pharmacies routinely filling prescriptions issued by this North Carolina prescriber and did not report any suspicious orders for Stores 3825, 3864, or 7238 to the DEA.

224. As another example, Walmart's compliance unit had ample warning that a Tampa, Florida physician was a "pill mill" doctor whose patients traveled great distances to visit his pain clinic and/or to fill his prescriptions at Walmart pharmacies located within a large radius from his pain clinic.

225. Fifty-five miles from Tampa, Store 959 in Bushnell, Florida, was the largest Walmart dispenser of the Tampa prescriber's prescriptions. Pharmacists at that store submitted several refusal-to-fill forms relating to the Tampa prescriber, and one of the pharmacists noted, among other things, "prescriber questionable."

226.   In June 2016, Walmart's Director of Controlled Substances notified Walmart's Regional Health and Wellness Director for Florida, Alabama, Mississippi, and Georgia that the Tampa prescriber was one of the top three prescribers for oxycodone 30mg at Store 5654 in Tampa, that 75 percent of this prescriber's prescriptions for oxycodone 30mg were for quantities of 120 dosage units or greater, and that the top-three drugs prescribed by this prescriber were oxycodone 30mg, hydromorphone 8mg, and methadone 10mg.

227.   A month-and-a-half later, in mid-August 2016, Walmart's Director of Controlled Substances told a director in the compliance unit and other Walmart compliance personnel that the Tampa prescriber was the number-one prescriber of oxycodone 30mg at Store 5964 in Tampa, accounting for 14 percent of all such prescriptions dispensed by Store 5964.

228.   Despite all of these warning signs of diversion, Walmart took no action to limit the shipment of controlled substances to pharmacies routinely filling prescriptions issued by the Tampa prescriber and did not report any suspicious orders for Stores 959, 5654, or 5964 to the DEA.

**Walmart Failed to Adequately Staff and Train its Compliance Personnel and Shipped Flagged Orders Before Compliance Personnel Could Examine Them**

229.   Although Walmart was the World's largest private employer at all relevant times and employed well over 1 million people in the United States alone, Walmart failed to devote sufficient personnel to operate its SOM program. Instead,

Walmart was woefully understaffed for reviewing flagged orders from its 5,000 pharmacies and determining which of those orders were suspicious, and therefore, had to be reported to the DEA.

230.   For at least part of the time from June 2013 through July 2015, compliance personnel working in Walmart's headquarters in Bentonville, Arkansas were not involved in detecting suspicious orders.

231.   Walmart recognized this arrangement as inadequate and, in the "Overview of SOM Project Progress" attached to a publicly-disclosed November 23, 2014 email, listed several problems associated with Walmart's failure to involve compliance personnel from the Company's headquarters in monitoring suspicious orders, including:

a.   "Inconsistent application of monitoring standards by associate[s] across DC facilities";

b.   "No consistent training for associates";

c.   "No dedicated [Home Office] resource"; and

d.   "SOM policy only included DC associate responsibilities – no [headquarters] involvement or cross-functional collaboration."

232.   Walmart's distribution centers were not staffed with enough personnel to evaluate all flagged orders.

233.   Of particular concern was that Walmart failed to devote sufficient staff

to monitoring orders of Schedule II controlled substances, which were the most dangerous controlled substances that Walmart distributed. All Schedule II controlled substances distributed by Walmart were distributed via its distribution center in Bentonville, Arkansas. The Bentonville distribution center filled Schedule II orders itself and served as the intermediary between Walmart's pharmacies and the independent distributors when it could not fill Schedule II orders on its own. At one point, there were only three employees at the Bentonville distribution center to review and evaluate hundreds of orders for Schedule II controlled substances that Walmart's own thresholds had flagged each day (and many more after hydrocodone was reclassified as a Schedule II drug effective October 6, 2014).

234.   Walmart also did not allow its staff adequate time to examine flagged orders for Schedule II drugs placed with the Bentonville distribution center. Although Walmart policy called for a temporary "hold" to evaluate orders that had tripped the company's thresholds, that "hold" was often overridden in favor of expeditious shipping to satisfy its pharmacies. At least at one point in time, if the Bentonville distribution center flagged orders exceeding 50 bottles but did not receive an instruction by 3 p.m. that same day as to whether the order was suspicious or appropriate for shipment, the distribution center shipped the unusually large order without notifying the DEA.

235.   At other distribution centers, Walmart similarly failed to provide its

staff with the ability to evaluate the stream of orders from its pharmacies.

236.   For example, the distribution center in Williamsport, Maryland, refused to devote adequate resources and personnel to properly evaluating orders that Walmart's SOM system had flagged for evaluation. As a result, it chose not to review every flagged order. In a memorandum circulated on or about October 11, 2013, E.O., an operations manager at the Williamsport distribution center, stated that there were "too many orders to review each line [of Reddwerks orders alerts] in detail."

237.   A year later, the problem had not been fixed. An internal presentation from October 2014 recognized that "[a]ll flags must be cleared before production on any items can begin, **so there is limited time for evaluation**."

238.   Walmart also failed to provide consistent, adequate training to the employees responsible for suspicious-order monitoring functions.

239.   First, Walmart assigned SOM functions such as detecting, rejecting, and reporting suspicious orders, approving orders in excess of a threshold, and cutting orders to or below thresholds, to distribution center personnel who Walmart knew had limited or no prior experience with suspicious-order monitoring or even with regulatory compliance of any kind.

240.   Second, Walmart failed to provide these employees with training specific to monitoring suspicious orders of controlled substances, including

appropriate training regarding drug diversion trends and the prescription drug abuse epidemic. Indeed, Walmart provided its staff with no training program, training materials, or written policies, procedures, or criteria specific to suspicious-order monitoring.

**Walmart Routinely Failed to Investigate Flagged "Orders of Interest" and Report Orders it was Unable to Clear to the DEA**

241.   As noted above, during this time period, Walmart set the following thresholds to flag unusually large orders for investigation: more than 20 bottles for Schedule II controlled substances, more than 50 bottles for Schedule III, IV, and V controlled substances, and order amounts that were 30% above the four-week average.

242.   Pharmacy Manual 21-402 (July 2014) required Walmart to hold and evaluate all orders flagged by its SOM system. The manual referred to such orders as "orders of interest" and noted specifically that they "warrant[ed] follow-up evaluation to determine whether … [they are] suspicious."

243.   Consistent with the manual, a Walmart Senior Manager for Logistics stated in a publicly-disclosed August 27, 2014 email: "Our obligation is to monitor all orders, **investigate 'orders of interest' (potentially 'suspicious' orders), hold any 'order of interest' until/unless the order is investigated and cleared** and report any 'suspicious' orders to DEA."

244.   Despite this clear policy, Walmart routinely failed to investigate

thousands of flagged orders.

245.   For example, Walmart generated an internal report referred to as an "Over 20 report," which flagged all orders for Schedule II controlled substances that were greater than 20 bottles. Walmart referred to orders of more than 20 bottles of Schedule II controlled substances as "orders of interest" that warranted additional evaluation.

246.   But in many cases, no Walmart personnel at any level completed any investigation of these "Over 20" orders of powerful Schedule II controlled substances.

247.   Walmart did not use these Over 20 reports to detect suspicious orders and report them to the DEA. Walmart has admitted that it shipped all Schedule II orders of between 21 and 50 bottles that its pharmacies placed—without conducting any meaningful investigation into those orders, and sometimes without conducting any investigation at all.

248.   From June 2013 to July 2015, Walmart shipped its pharmacies at least 66,000 Schedule II orders in which the weekly totals ranged from 21 to 50 bottles.

249.   In addition, the Rogers, Arkansas distribution center routinely shipped orders it had flagged for review without actually reviewing them.

250.   For at least part of the Distribution Period, the Rogers distribution center did not use Reddwerks to identify suspicious orders but, instead, used a

system called KNAPP.

251.   KNAPP was an order fulfillment system, but it had very limited ability to detect unusual orders of controlled substances.

252.   Under the KNAPP system, once an order was "flagged" by the Rogers distribution center for further evaluation, the system could not "hold" that specific order while the order was scrutinized to determine if it was suspicious or not. Instead, due to limitations of the KNAPP system, if the Rogers distribution center held a pharmacy's order for further evaluation, then all the other orders would also be held and not shipped.

253.   In a publicly disclosed email dated August 25, 2014, a Walmart Senior Manager for Logistics noted that some Walmart employees were "uncomfortable with our inability to find a systemic or manual solution that would allow us to 'hold' orders pending evaluation." The email further stated that Practice Compliance "would prefer to move all of the Control drug business out of [the Rogers distribution center] and to McKesson until the KNAPP solution is in place."

254.   However, Walmart did not move its controlled-substance business from the Rogers distribution center to McKesson, instead continuing to use KNAPP and operate a system that Walmart knew was flawed.

255.   The "Overview of SOM Project Progress" listed specific deficiencies with KNAPP, noting that:

      a.     The Rogers distribution center "had very limited ability to monitor orders – KNAPP does not include monitoring functionality"; and

      b.     "System (Reddwerks or KNAPP) did not allow alerted orders to be 'held' pending evaluation."

256. Because KNAPP did not enable Walmart to hold an order while evaluating that order, Walmart routinely shipped suspicious orders without evaluating them and without reporting them to the DEA. In fact, during this time, the Rogers distribution center reported no suspicious orders at all.

## Walmart Failed to Document its Evaluation of Flagged Orders

257. Walmart's SOM policy required compliance personnel to evaluate flagged orders and then document those evaluations.

258. Under Pharmacy Manual 21-402 (July 2014), Walmart's evaluations of flagged orders were to be documented using the "Order of Interest Evaluation Form." The policy stated that "[a]ll documentation related to Order of Interest evaluations, determination of Suspicious Orders, and federal and state reporting must be retained for three years."

259. Likewise, Walmart's Practice Compliance division adopted a policy in January 2015, referred to as "Controlled Substances Suspicious Order Monitoring," which required Walmart to "document the final conclusion of the evaluation" and "retain documentation of any reports made to the DEA and state agencies."

260.   However, prior to 2015, Walmart had no system or process in place to document and retain this information.

261.   Walmart recognized this flaw with its SOM system. The October 2014 internal presentation noted that there was "[n]o defined process for tracking why DC cuts or clears specific orders." Likewise, the "Overview of SOM Project Progress" acknowledged that Walmart had "[n]o process for documenting order evaluations or reporting decisions."

262.   In those instances when Walmart conducted some due diligence on flagged orders, it often did not record the factual information it may have gathered about the order or the conclusion it made as to whether or not the order was suspicious.

263.   For example, from June 26, 2013, through July 31, 2015, Walmart shipped tens of thousands of weekly orders of Schedule II controlled substances and Schedule III narcotics that exceeded Walmart's own established thresholds without documenting facts about those shipments necessary to determine if those orders or future orders from the same pharmacies were suspicious.

264.   Because Walmart did not maintain these records, Walmart compliance personnel charged with scrutinizing and determining whether an order from one of its 5,000 pharmacies was suspicious lacked the necessary facts to complete their important gatekeeping role with respect to other orders.

**Walmart's Detection and Reporting System Remained Defective**

265.   Walmart recognized the extensive flaws with its SOM program and the limitations of the Reddwerks and KNAPP systems, and attempted to address the flaws through a few modifications.

266.   Walmart hired a consulting firm, Mu Sigma, to review a statistical methodology for identifying suspicious orders that Walmart had designed on its own. Walmart's proposed statistical methodology would implement pharmacy-specific and drug-specific thresholds to replace the 20-bottle and 50-bottle thresholds that Walmart had been using in Reddwerks.

267.   Mu Sigma reviewed Walmart's proposed revisions to its system and identified several flaws with the proposed statistical methodology. According to a January 2014 Mu Sigma report to Walmart, the "shortcomings" in Walmart's proposed approach included an inability to detect patterns over time and one-size-fits-all minimum thresholds.

268.   Mu Sigma proposed a more effective methodology that would capture outlier orders missed by Walmart's proposed approach.

269.   Walmart rejected Mu Sigma's proposed approach in part due to cost. In March 2014, K.S., a Senior Manager for Logistics, expressed, "[Mu Sigma] quoted us $185,000 for the work which, I think, is ridiculous." That year, Walmart reported operating profit of approximately $27 billion.

270.    In or about August 2015, Walmart implemented the statistical methodology that Mu Sigma had informed Walmart was flawed.

271.    Walmart continued to use this modified system from approximately August 2015 through November 29, 2017.

**Despite the Modifications to Reddwerks, Many Flaws Remained**

272.    Walmart's modifications to Reddwerks failed to fix many of the serious defects from its prior SOM program.

273.    Walmart's modified SOM program still failed to detect whether orders were of an unusual frequency or unusual pattern, much less report those kinds of unusual orders.

274.    Walmart's modified SOM program continued to ignore known incidents of diversion occurring at its pharmacies.

275.    Moreover, Walmart's modified SOM program still did not consider whether a pharmacy was ordering the same controlled substance of the same drug strength, but with multiple NDCs. As noted above, this defect permitted pharmacies to place orders well beyond the size thresholds without those orders ever being flagged.

276.    In addition, Walmart's modified SOM program, when determining whether an order placed with a Walmart distribution center was suspicious, continued to ignore at least hundreds of thousands of orders that its pharmacies

placed with independent distributors.

277.   Walmart still had no visibility into orders that Sam's Club-branded pharmacies placed directly with AmerisourceBergen. For example, in November 2015, a pharmacist at a Sam's Club-branded store requested a threshold increase directly from AmerisourceBergen, bypassing Walmart's compliance unit. In a publicly-disclosed December 2015 email, a Walmart Director of Controlled Substances, recognized that threshold-increase requests made by Sam's Club-branded pharmacies directly to AmerisourceBergen limited Walmart's "visibility into Sam's from a SOM standpoint."

278.   Even as late as May 2017, Walmart had the same lack of visibility into orders that Walmart-branded pharmacies placed directly with McKesson. In a publicly disclosed May 3, 2017 email, a Walmart Director of Controlled Substances discussed the rollout of a new project that would "reduce the number of orders going directly to McKesson from the pharmacy. Those direct to McKesson orders limit our ability to get full visibility to what pharmacies order and this project will be very helpful to us."

279.   As a consequence of these continuing problems with its SOM system, Walmart failed to report at least hundreds of thousands of suspicious orders to the DEA, in violation of the law.

**Walmart Continued Failing to Report Unusually Large Orders**

280.   In mid-2015, Walmart changed the Reddwerks thresholds that it used to detect unusually large orders placed by its pharmacies.

281.   Walmart modified its prior approach of applying uniform numeric thresholds to its pharmacies' orders (*i.e.*, the 20-bottle threshold for Schedule II drugs and the 50-bottle threshold for Schedule III, IV, and V drugs). Instead, it imposed pharmacy-specific, drug-specific, weekly thresholds.

282.   To set these new thresholds, however, Walmart chose a flawed approach that would detect suspicious orders only in the rarest of instances. For pharmacies that typically ordered large quantities, Walmart flagged all orders that were more than three standard deviations from that pharmacy's average order size for that drug. For pharmacies that typically ordered smaller quantities, Walmart flagged all orders that were more than three standard deviations from the average order size of all of Walmart pharmacies' orders for that drug.

283.   Walmart adopted this approach despite knowing that it was likely to cause Walmart not to detect many orders that were outliers. Indeed, in early 2014, Mu Sigma, the consulting firm working with Walmart to validate its proposed new methodology, had warned Walmart that Walmart's approach might not detect some unusually large orders.

284.   Also, in setting pharmacy-specific thresholds, Walmart chose baselines

that were flawed. Walmart used pharmacy averages based on orders from a 52-week period during a time when, as Walmart was well aware, the prescription drug abuse epidemic was raging across the country.

285.   Had Walmart lawfully rejected and reported suspicious orders before it modified the Reddwerks system, then these order averages would have been lower. But by relying on already excessive orders to calculate a pharmacy's average order, Walmart created an inflated average that masked the suspicious nature of those – and subsequent – orders.

286.   Walmart's decision to set thresholds for pharmacies based on inflated pharmacy averages caused Walmart to fail to report suspicious orders.

287.   The lowest possible threshold for any controlled substance was 2,000 dosage units per week. Walmart had simply decided that the minimum threshold for flagging an order – no matter which pharmacy had placed the order and how small that pharmacy's average order plus three standard deviations was – would be 2,000 dosage units per week.

288.   For many of Walmart's pharmacies, the 2,000-unit minimum threshold for triggering suspicious-order monitoring was far too high to enable Walmart to detect whether an order was unusually large.

289.   Some pharmacies, for instance, typically ordered far below 2,000 dosage units of particular drugs in any given week. This minimum threshold meant

that those pharmacies could place an order for an unusually large quantity *for that pharmacy* without that order ever being flagged.

290.   The inadequacy of the 2,000-unit minimum threshold for detecting unusually large orders is illustrated by considering a hypothetical Walmart pharmacy's orders. For example, suppose that over the course of a year, a Walmart pharmacy had received an average of 350 units of oxycodone-acetaminophen 5/325mg per week, and its average plus three standard deviations was 1,100 units of oxycodone-acetaminophen 5/325mg. In that scenario, under the modified SOM system, Walmart would have significantly raised that pharmacy's threshold from 1,100 dosage units to the minimum threshold of 2,000 dosage units. Accordingly, that pharmacy could have placed an unusually large order of oxycodone-acetaminophen 5/325mg – more than five times its average amount of this powerful opioid – without that order being flagged as an unusual size for that pharmacy.

291.   As a result of the 2,000-unit minimum threshold, Walmart failed to detect aberrant order sizes for those pharmacies that typically ordered smaller amounts of drugs and, therefore, failed to report many suspicious orders to the DEA.

292.   From August 2015 through November 2017, Walmart continued to manipulate its SOM program in a manner that avoided reporting unusually large-sized orders to the DEA.

293.   During this period, for some orders that exceeded size thresholds,

Walmart continued to "cut," *i.e.,* reduce the size of, those orders, and then shipped the reduced order without reporting the initial order to the DEA.

294.   Walmart engaged in cutting orders on a routine basis. For example, over the course of four separate weeks in the fall of 2015, Walmart cut and shipped more than 50 orders without ever reporting these orders to the DEA.

295.   Sometimes, Walmart did not simply reduce an unusually large order, but rejected the order altogether without filing a suspicious-order report with the DEA. Over the course of four separate weeks in the fall of 2015, Walmart rejected more than 30 orders by cutting those orders down to zero bottles. Walmart did not file a suspicious-order report for any of these rejected orders.

296.   Upon information and belief, Walmart continued to cut certain unusually large orders to zero bottles through at least November 29, 2017.

297.   Sometimes, Walmart recorded in Archer that it was not filling the original order, but instead cut the order down to the maximum threshold amount, without further explanation. In other words, Walmart's response to an unusually large order was to ship the pharmacy the largest amount it could ship that was consistent with the threshold – without any apparent investigation of the unusually large order and without reporting the order to the DEA.

298.   For instance, on September 24, 2015, Store 3633 in Waynesboro, Pennsylvania, placed an order for 12 bottles of buprenorphine HCL 8mg. The order

was flagged in Walmart's SOM system and went to the Company's headquarters in Bentonville, Arkansas for evaluation. Personnel from headquarters called the pharmacy at Store 3633, which in turn related that the pharmacy "just wanted to receive the weekly threshold." On September 24, 2015, Walmart's headquarters personnel "cut" the order down to 11 bottles. Walmart never reported the initial suspicious order of 12 bottles to the DEA. The "reason code" for the cut order in Reddwerks was listed simply as "Error-System(POS)."

299.   The next day, on September 25, 2015, Store 3633 placed an additional order for two bottles of buprenorphine HCL 8mg. The order was flagged in Walmart's SOM system and went to Bentonville for evaluation. Walmart "cut" the order down to zero bottles. Walmart never reported the suspicious order of two bottles to the DEA. The "reason code" for the cut order in Reddwerks was listed as "Error-System(POS)."

300.   The same day, Walmart took the same approach with an order from a different pharmacy. On September 25, 2015, Store 2281 in West Mifflin, Pennsylvania, placed an order for nine bottles of buprenorphine HCL 8mg. The order was flagged in Walmart's SOM system and went to Bentonville for evaluation. Personnel from Bentonville called the pharmacy at Store 2281, which in turn related that the pharmacy "would only like to receive the weekly threshold amount." On September 25, 2015, Walmart "cut" the order down to four bottles. Walmart never

reported the suspicious order of nine bottles to the DEA. The "reason code" for the cut order in Reddwerks was listed as "Error-System(POS)."

301.   At other times, Walmart would record in Archer that the original order was a "mistake" or "error," without any explanation of the nature of the alleged mistake or error.

**Walmart Disregarded its Own "Hard Limits"**

302.   Another problem with Walmart's SOM system during this time period was that Walmart allowed its pharmacies to exceed hard limits that it had imposed on certain controlled substances following the submission of a suspicious-order report to the DEA.

303.   In those rare instances when Walmart filed a suspicious-order report with the DEA for an unusual order placed by a pharmacy, Walmart would sometimes put the pharmacy on a "remediation plan." When a Walmart pharmacy was placed on a remediation plan, Walmart would often reduce the quantity of the particular drug and strength that had been the subject of the suspicious-order report. Walmart accomplished this reduction by assigning the pharmacy a weekly hard limit for that drug. The duration of the remediation plan was usually one to two months.

304.   Walmart distribution centers often blatantly disregarded the weekly hard limit set in remediation plans.

305.   For example, Walmart placed Store 2530 in Rutland, Vermont, on a

two-month remediation plan following the March 2, 2017 placement of a suspicious order of 23 bottles of buprenorphine HCL 8mg, an order that brought that pharmacy's weekly total to 65 bottles. The remediation plan limited Store 2530 to a weekly hard limit of 50 bottles for this drug through May 5, 2017. However, during two separate weeks over the course of the remediation period, Walmart shipped 71 bottles and 67 bottles, respectively, to Store 2530 without reporting these orders to the DEA.

306.   Store 2530 exceeded its remediation-plan hard limit for two additional weeks by placing buprenorphine HCL 8mg orders fulfilled by both McKesson and Walmart. Over a one-week period in April 2017, Walmart shipped 50 bottles of buprenorphine HCL 8mg to Store 2530, and McKesson shipped two bottles, for a total of 52 bottles, exceeding the remediation plan hard limit by two bottles. During the last week of Store 2530's remediation plan in May 2017, Walmart shipped 50 bottles of buprenorphine HCL 8mg to the pharmacy, and McKesson shipped 106 bottles. The total of 156 bottles in that one week was more than three times Store 2530's remediation-plan hard limit of 50 bottles.

307.   In another example, following an August 23, 2017 suspicious order of 42 bottles of hydrocodone-acetaminophen 10/325mg for a total weekly order of 79 bottles, Walmart placed Store 130 in Muskogee, Oklahoma, on a remediation plan for hydrocodone-acetaminophen 10/325mg. The remediation plan limited Store 130

to a weekly hard limit of 50 bottles of hydrocodone-acetaminophen 10/325mg from August 25, 2017 through October 20, 2017. Yet during at least one week of the remediation plan, Walmart shipped 61 bottles to the pharmacy, ignoring the 50-bottle weekly limit without reporting this order to the DEA.

308.   All of the significant shortcomings from the initial Reddwerks system and the modified Reddwerks system rendered Walmart's SOM program ineffective and, as a result, Walmart failed to detect and report suspicious orders to the DEA, as required by law.

309.   From June 26, 2013 through November 29, 2017, Walmart shipped approximately 15.2 million orders of Schedule II controlled substances and Schedule III narcotics to its own pharmacies. This figure does not include any other Schedule III controlled substances, or any Schedule IV and Schedule V controlled substances. Nor does it include orders shipped to Walmart pharmacies from outside distributors. From June 26, 2013 through November 29, 2017, Walmart shipped approximately 37.5 million Schedule II, III, IV and V orders to its pharmacies. During the same time period, Walmart reported only 204 suspicious orders to the DEA—an infinitesimal percentage.

310.   Walmart's infinitesimally low rate of suspicious-order reporting is incredible. The small number of suspicious orders Walmart reported cannot be credibly attributed to a lack of unusual or otherwise suspicious orders placed by its

pharmacies.

311.   By comparison, McKesson, the independent distributor that served as the back-up distributor to Walmart-branded pharmacies, received far fewer orders from Walmart's pharmacies but reported to the DEA more than 13,000 suspicious orders from Walmart pharmacies between June 26, 2013 and November 29, 2017.

312.   Walmart's failure to report suspicious orders stems from Walmart's decisions to operate a system that failed to detect suspicious orders and to manipulate that system to avoid reporting to the DEA those suspicious orders that were detected.

313.   Walmart's failure to detect and report suspicious orders not only violated the law, but also inhibited Walmart's ability to timely investigate the suspicious orders and uncover potentially unlawful conduct.

314.   Before reporting suspicious orders to the DEA, Walmart first had to identify the suspicious orders for itself. The regulation explains that the distributor must design and operate a system "to disclose *to the registrant* suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b).

315.   If Walmart had properly identified suspicious orders in the first place, as required by the regulation, steps could have been taken to investigate the orders.

316.   █████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████



317.   If Walmart had complied with its obligation to detect and report suspicious orders, it would have investigated the reasons for those orders and initiated remediation plans.  It thus could have taken steps that might have led to the timely detection of unlawful, improper, or dangerous conduct. For example, Walmart could have discovered that the unusually high demand for a controlled substance at a particular pharmacy was resulting from dispensing at that pharmacy for a "pill mill" prescriber.

318.   For the at least hundreds of thousands of suspicious orders that Walmart never even identified, Walmart did not institute remediation plans to inquire into the orders, and it never informed the DEA of those suspicious orders.

319.   When Walmart fulfilled suspicious orders, Walmart's approach allowed dangerous controlled substances to flood the communities it purportedly served. Even in those circumstances where Walmart recognized that certain orders

were "suspicious" after those orders had already been shipped to its stores, Walmart's failure to report those orders and take other remedial steps allowed the ordered drugs to "enter the market." As a Senior Manager for Logistics wrote in a publicly-disclosed August 20, 2014 email, "[t]he alternative to pulling the order back is to simply continue to follow the process we have today. We can add further evaluation of orders after shipment but, if we see an issue that suggests that product shouldn't have been shipped, we just leave it at the store and let it enter the market. Given the choices, [having the store] ship… the product back feels like the more socially responsible approach, but the [Distribution Center] will do whatever leadership wants them to do."

320.   Walmart's systematic failure, for years, to comply with its legal obligation to detect and report each of its suspicious orders thus created a major obstacle to efforts to combat the prescription drug abuse epidemic.

321.   Walmart also financially benefited from these violations of law. Walmart chose to avoid the expense of creating and implementing a proper program for monitoring and reporting suspicious orders. For example, Walmart avoided the expense of creating and implementing a remediation plan for each suspicious order, which could have imposed burdens on Walmart and might also have uncovered improper activity that Walmart would have to remediate. Likewise, Walmart avoided the expense of paying for adequate numbers of compliance personnel. Most

critically, Walmart profited by providing its pharmacies with unusually large quantities of controlled substances to sell, and from selling other products to customers who came to Walmart stores only because Walmart pharmacies would readily provide these controlled substances.

322.   In sum, Walmart chose, for years, to disregard a well-established legal obligation on a systematic basis and a huge scale involving at least hundreds of thousands of orders of controlled substances. In doing so, Walmart increased the risk of undetected unlawful conduct and contributed to serious widespread harm from the nationwide prescription opioid abuse epidemic.

**THE INDIVIDUAL DEFENDANTS IGNORED THE COMPANY'S**
**FAILURE TO ADOPT AN APPROPRIATE COMPLIANCE PROGRAM**

323.   ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

324.   After Walmart and the DEA entered the MOA in 2011, there is no question that the Board knew about the Company's misconduct, its failure to have an appropriate compliance program in place, and its obligation to take remedial action going forward.

325.   The Board, however, failed to implement and maintain an appropriate compliance program despite having notice that its compliance program was

ineffective and that it was subject to the MOA and ongoing obligations to address

diversion issues.

326. 

327.

328.

329. 

330.

331.

332.



333.

334.

335.

336.



337.

338.

339.

340.



341.

342.

343.

344.



345.

346.

347.

348. 

349.

350.

351. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

352. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

353.

354.

355.

356. 

357.



358.

359.

360.

361.

362.

363. 

364.

365.

366.   According to a September 27, 2019 letter to the Department of Justice written by the Jones Day law firm on behalf of Walmart, the DOJ had been conducting a civil investigation into the Company regarding violations of the CSA and FCA for nearly 3 years. Walmart produced nearly 1 million pages of documents and 6 million individual prescription records to the government. To investigate Walmart, the government had established a national "Working Group" consisting of 15 U.S. Attorneys' offices across the country as well as the Civil Fraud Section of the Civil Division, the Narcotics and Dangerous Drug Section of the Criminal Division, and the Consumer Protection Branch of the Civil Division.

367.   While the letter insists that Walmart had done nothing wrong, it recognized that prosecutors in Texas recently threatened a former Walmart compliance employee with indictment. Indeed, in the prior year, Walmart had been threatened with indictment but reportedly it was quashed by political appointees to the DOJ and elsewhere. Indeed, Walmart was subject to a tolling agreement with the DOJ that was scheduled to expire on October 25, 2019 concerning possible charges. Walmart was also subject to numerous questions and interviews from members of the Working Group.

368.   In fact, beginning on or about December 7, 2016, the DEA had begun an investigation into Walmart, having first issued five subpoenas to the Company. Walmart complied with the subpoenas. On several occasions, Walmart met with federal prosecutors from Texas in an effort to explore a possible resolution.

369.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

## THE CURRENT DIRECTOR DEFENDANTS MADE MISLEADING STATEMENTS IN THE COMPANY'S 2020 PROXY

370.   Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these Defendants, and they do not

allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

371.   On April 23, 2020, the Company issued its 2020 Proxy filed on Form DEF 14A (the "**2020 Proxy**") for the 2020 Annual Meeting of Stockholders, which was scheduled to be held on June 3, 2020.

372.   In the 2020 Proxy, the Current Defendants solicited stockholder votes to, among other things, reelect all eleven of them to the Board.

373.   The Current Director Defendants negligently issued misleading statements with respect to these solicited votes.

374.   As detailed above, the Company entered an MOA that was in effect from March 2011 through March 2015, pursuant to which Walmart agreed from then on to "maintain a compliance program, updated as necessary, designated to detect and prevent diversion of controlled substances as required by the Controlled Substances Act." Under the MOA, the compliance program mandated procedures to ensure that Company pharmacists identified "red flags" and or other suspicious circumstances concerning the distribution of controlled substances. Accordingly, the Board was under a duty to ensure that the Company complied with these obligations, which it did not do.

375.   Nevertheless, the 2020 Proxy falsely touted Board members' purported oversight activities – which ran afoul of the duties mandated by the MOA and controlled substances laws.

376.   In support of the Current Director Defendants' bid for reelection, the 2020 Proxy presented the Company's "Corporate Governance Highlights." While touting the "expansion of convenience and delivery options," the 2020 Proxy did not discuss efforts concerning anti-diversion policies, nor did they make any meaningful reference to actions taken to stem the opioid epidemic, despite the issues plaguing the Company. The 2020 Proxy touted the effectiveness of the Governance Committee, which was designed to "enhance the effectiveness of the Board's risk oversight function" and "perform the risk oversight functions described [herein]."

377.   With respect to the Audit Committee, the 2020 Proxy touted all four members' international business experience, that three had accounting and financial reporting experience, and that two members had regulatory/legal risk management oversight experience." Though the committee's "Primary Responsibilities" include myriad duties, there is no reference concerning its obligation to oversee opioid issues or compliance with the CSA and DEA regulations. Indeed, the statement that the Audit Committee "[r]eviews risk assessment and risk management process and policies, processes and procedures regarding compliance with applicable laws and regulations, as well as Global Statement of Ethics and Code of Ethics for the CEO

and Senior Financial Officers" is false because there was no meaningful oversight over the Company's distribution of the controlled substances that fueled the opioid crisis.

378.   With respect to the Governance Committee, the 2020 Proxy again touts the experience of its three members. The 2020 Proxy further states that the committee "reviews and advises management on environmental, social, and community initiatives, as well as legislative affairs and public policy engagement." However, there is no indication whatsoever that this committee had any role in overseeing the Company's anti-diversion policies or the malfeasance that was occurring at the pharmacy level, though it was under an affirmative obligation to do so under the MOA and applicable rules and regulations concerning controlled substances.

379.   The 2020 Proxy further discusses the Board's strategic oversight role. The 2020 Proxy states that, in executing this function, "certain Board meetings are enhanced with 'hands-on' experiences, such as visits to our stores and other facilities or technology demonstrations." The 2020 Proxy further states that the Board takes an active role in risk oversight:

> Walmart identifies, assesses, and assigns responsibility for managing risks through its annual enterprise risk assessment process, other internal processes, and internal control environment. The Board, Board committees, and management coordinate risk oversight and management responsibilities in a manner that we believe serves the long-term interests of our

company and our shareholders through established periodic reporting and open lines of communication.

Board Oversight:

- Has primary responsibility for overseeing risk management

- Evaluates and approves strategic objectives and defines risk tolerance

- Delegates certain risk management oversight responsibilities to Board committees

- Receives regular reports from Board committee chairs and management regarding risk-related matters.

380. These statements were false and misleading because they failed to disclose that the Board and its committees had taken little to no action with respect to anti-diversion and compliance issues concerning opioids or the Company's failure to address issues observed at the pharmacy level concerning suspicious prescriptions. Indeed, ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████. These issues were still ongoing.

381. In fact, the word "opioid" appears only one time in the entire 2020 Proxy as part of a lengthy list of issues about which management may have briefed the Audit Committee during the prior year. ████████████████ ████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████

## DAMAGES TO WALMART

382.   The Individual Defendants' participation in the wrongdoing detailed above and their failure to remedy the Company's improper business practices have exposed Walmart to billions of dollars in liability for individual, class action, and government lawsuits. Walmart has been named as a defendant in numerous lawsuits brought by various federal, state, and local governments related to the Company's unlawful distribution of opioids. As the Company admitted in its Annual Report on Form 10-K filed with the SEC on March 20, 2020, the Company is "a defendant in numerous litigation proceedings related to opioids," which are so voluminous that it "cannot reasonably estimate any loss or range of loss that may arise from such claims and the related opioid matters," but which nevertheless "may adversely affect" its financial condition.

383.   Walmart's role in the opioid epidemic has also damaged its reputation within the business community, with the public, and in the capital markets. Walmart professes to value its reputation, quoting founder Sam Walton in its Code of ethics:

> Don't compromise your reputation. It's a precious commodity.
> Don't compromise your integrity… have a good name."
>
> -   Sam Walton, Founder

384.   As defendant McMillon states in the introduction to the Code of Ethics:

> We believe in everyday low costs and everyday low prices, but only if accomplished through our everyday integrity.

385.   In addition to its own professions about the value of its reputation, Walmart's customers, counterparties and prospects consider its ability to comply with laws, rules, and regulations designed to address and decrease the opioid epidemic. The government is less likely to be accommodating to companies that have problems complying with the law. In addition, the Company stands to incur higher marginal costs of capital and debt because the false and misleading statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

386.   The damage to the Company's reputation as a result of the Board's failure to implement a functional diversion control and compliance program has been immense. Further, as a direct and proximate result of the Individual Defendants' actions, Walmart has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)   costs incurred from defending and paying any settlement in the opioid lawsuits and investigations brought by states, counties, municipalities, governmental entities, and tribes in various federal, state, and other courts against the Company, including, without limitation, in the MDL and the U.S. Department

of Justice's suit against the Company styled *U.S. v. Walmart*, Case No. 20-01744 (D. Del.).

     (b)    costs incurred in complying with the government investigations into the misconduct detailed herein, including any fines or penalties resulting therefrom; and

     (c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Walmart.

## DEMAND FUTILITY

387.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

388.   Plaintiff brings this action derivatively on behalf of Walmart to redress the injuries to the Company suffered as a result of the Individual Defendants' misconduct.

389.   Plaintiff currently owns shares of the Company's common stock and has owned shares of the Company's stock continuously since October 2010 and throughout the entire period of the Individual Defendants' misconduct.

390.   Plaintiff understands his obligation to hold shares of the Company's common stock for the duration of this action and is prepared to do so.

391.  Plaintiff will adequately and fairly represent the interests of Walmart in enforcing and prosecuting its rights and is represented by counsel experienced in stockholder derivative litigation.

392.  The Board consists of the following eleven directors: Current Director Defendants (i) Conde, (ii) Flynn, (iii) Friar, (iv) Harris, (v) Horton, (vi) Mayer, (vii) McMillion, (viii) Penner, (ix) Reinemund, (x) Rob Walton, and (xi) Steuart Walton.

393.  Plaintiff did not make a demand on the Board prior to bringing this stockholder derivative suit because at least half the Board (*i.e.*, six directors) faces a substantial likelihood of personal liability for their misconduct. Further, there is reason to doubt that at least half the Board could have made an independent and disinterested decision to bring the claims asserted in this action. Accordingly, pre-suit demand is excused as futile.

## At Least Half the Board Faces a Substantial Likelihood of Personal Liability

394.  Demand is futile because at least half the Board (*i.e.*, at least six directors) faces a substantial likelihood of personal liability.

395.  As alleged above, all eleven Current Director Defendants violated Section 14(a) of the Exchange Act by negligently making the misstatements and omissions in the 2020 Proxy. It is against public policy to indemnify individuals for violations of Section 14(a) of the Exchange Act. Accordingly, any indemnification provided by the Company to these eleven defendants does not protect them from

violations of Section 14(a) in the 2020 Proxy. As a result, the eleven Current Director Defendants face a substantial likelihood of liability, excusing demand.

396.   Furthermore, all eleven Current Director Defendants breached their fiduciary duties of loyalty by abdicating their responsibility to exercise proper oversight of Walmart. The Current Director Defendants were, at all relevant times, well aware of the stringent government regulation over controlled substances distribution, the Company's DEA reporting requirements, the MOA, and the opioid epidemic facing the nation – especially considering that Walmart is the fifth largest pharmacy chain in the United States. Yet they still failed to act.

397.   In addition, all eleven Current Director Defendants disregarded the responsibilities that Walmart's own Code of Ethics and Corporate Governance Guidelines imposed on them. In short, the Code of Ethics and Corporate Governance Guidelines require the Company's officers, directors, and employees to obey the law. Notwithstanding the provisions of the Code of Ethics and Corporate Governance Guidelines, each of the eleven Current Director Defendants acquiesced to, if not participated in, the decision to continue saturating the market with opioids and failed to monitor and report suspicious orders to the proper authorities by failing to implement an appropriate anti-diversion and control program. The eleven Current Director Defendants knew of the duties imposed on them but failed to act, resulting in Walmart's massive revenues gained from its years-long distribution and

dispensing of highly addictive opioids in contravention of the CSA and its duties under the MOA.

398.   Individual Defendants (i) Conde, (ii) Flynn, (iii) Friar and (iv) Horton, as members of the Audit Committee, also reviewed and approved the improper statements in the 2020 Proxy. Thus, these four Individual Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's regulatory compliance and disclosure controls. Despite their knowledge or reckless disregard, these four defendants caused the improper statements in the 2020 Proxy. Accordingly, these four defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, these four defendants face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

399.   Walmart's history of non-compliance with the CSA and knowledge of the opioid epidemic render this derivative action distinct from those concerning most other corporate boards. A typical corporate board might plausibly claim ignorance when it comes to compliance failures. Here, however, the MOA specifically required the Company to create a robust compliance program. The Board's failure to carry out the terms of the MOA for years, thus permitting Walmart to repeatedly violate the CSA, cannot be regarded as the valid exercise of business judgment.

**There is Reason to Doubt that at Least Half the Board Could Have Made an Independent and Disinterested Decision**

400.   Demand is also futile because there is reason to doubt that at least half the Board (*i.e.*, six directors) could have made an independent and disinterested decision to bring the claims asserted in this Action.

401.   **Flynn** joined the Board in 2012 and was a director during the period that the MOA was effective. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He was aware of the MOA but ignored his obligation to cause Walmart to abide by those obligations. His obligation to cause Walmart to abide by those obligations is underscored by his being the Chairman of the Audit Committee. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

402.   **Horton** joined the Board in 2014 and was a director during the period that the MOA was effective. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He was aware of the MOA but ignored his obligation to cause Walmart to abide by those obligations. His obligation to cause Walmart to abide by those obligations is underscored by his membership on the Audit Committee and his being the Chairman of the Governance Committee.

Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

403. **Mayer** joined the Board in 2012 and was a director during the period that the MOA was effective. Accordingly, she served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. She was aware of the MOA but ignored her obligation to cause Walmart to abide by those obligations. Accordingly, there is reason to doubt that she could have made an independent and disinterested decision to bring the claims asserted in this action.

404. **McMillon** joined the Board in 2013 and was a director during the period that the MOA was effective. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He was aware of the MOA but ignored his obligation to cause Walmart to abide by those obligations. His obligation to cause Walmart to abide by those obligations is underscored by the fact that he has been the Company's President and CEO since 2014. He has worked at Walmart for over 30 years and has received over $160 million in compensation since 2013. Moreover, the Company does not consider him independent, as set forth in the 2020 Proxy. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

405.    **Penner** joined the Board in 2012 and was a director during the period that the MOA was effective. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He was aware of the MOA but ignored his obligation to cause Walmart to abide by those obligations. Moreover, the Company does not consider him independent, as set forth in the 2020 Proxy. His father-in-law is defendant Rob Walton and he is related to defendant Steuart Walton by marriage. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

406.    **Reinemund** joined the Board in 2010 and was a director during the period that the MOA was effective. Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He was aware of the MOA but ignored his obligation to cause Walmart to abide by those obligations. His obligation to cause Walmart to abide by those obligations is underscored by his membership on the Governance Committee. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

407.    **Rob Walton** is the son of Walmart founder Sam Walton and joined the Board in 1978. He was a director during the period that the MOA was effective.

Accordingly, he served as a director of the Company during some or all of the wrongdoing alleged herein, knew of the wrongdoing, and failed to act in the face of a known duty to act. He was aware of the MOA but ignored his obligation to cause Walmart to abide by those obligations. Moreover, the Company does not consider him independent, as set forth in the 2020 Proxy. He is defendant Penner's father-in-law and defendant Steuart Walton's uncle. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

408.   **Steuart Walton** is Walmart founder Sam Walton's grandson. He is defendant Rob Walton's nephew and related by marriage to defendant Penner. The Company does not consider him independent, as set forth in the 2020 Proxy. Accordingly, there is reason to doubt that he could have made an independent and disinterested decision to bring the claims asserted in this action.

409.   Thus, in addition to a majority of the Board facing a substantial likelihood of personal liability, there is reason to doubt that at least six of the Company's eleven directors would make an independent and disinterested decision about whether to pursue the claims asserted in this action. Accordingly, demand is excused as futile.

## CLAIMS FOR RELIEF

## COUNT 1

### Against the Current Director Defendants
### for Violation of § 14(a) of the Exchange Act

410.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

411.   The eleven Current Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders, which were contained in the 2020 Proxy. The 2020 Proxy solicited stockholder votes to reelect the eleven Current Director Defendants.

412.   The 2020 Proxy, however, misrepresented and failed to disclose that the Company was engaging in a scheme to gain illicit profits through unlawful means, in direct violation of its federal and state anti-diversion and reporting obligations for distributing controlled substances. By reasons of the conduct alleged herein, the Current Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Walmart misled and deceived its stockholders by making misleading statements that were essential links for stockholders heeding the Company's recommendation to reelect the eleven Current Director Defendants to the Board. Plaintiff seeks relief for damages inflicted upon the Company based upon the misleading 2020 Proxy.

413.   Plaintiff, on behalf of Walmart, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

414.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

415.   By reason of their status as directors and/or officers of the Company, the Individual Defendants owed and owe Walmart fiduciary duties of loyalty, candor, and good faith.

416.   The Individual Defendants breached their fiduciary duties of candor, good faith, and loyalty by creating a culture of lawlessness within Walmart, or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

417.   The Individual Defendants, as current and/or former directors of the Company, owed and owe Walmart the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the unlawful opioid distribution scheme. The Individual Defendants knew or were reckless in not knowing that the Company engaged in a scheme to proliferate the spread of opioids while failing to comply with the federal and state anti-diversion and reporting obligations for distributing controlled substances. The Individual Defendants further breached the Company's Code of Ethics and

Corporate Governance Guidelines. Accordingly, these defendants breached their duty of loyalty to the Company.

418.   The Audit Committee Defendants further breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit Committee, and which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results as required by the Audit Committee Charter in effect at the time of their membership on the Audit Committee.

419.   The Governance Committee Defendants further breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Governance Committee, and which they knew or were reckless in not knowing contained improper statements and omissions. The Governance Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results as required by the Governance Committee Charter in effect at the time of their membership on the Governance Committee.

420.   Further, McMillon, in his capacity as an officer, either knew, was reckless, or was grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. As an officer, McMillon either knew, was

reckless, or was grossly negligent in not knowing that the Company engaged in a scheme to proliferate the spread of opioids while failing to comply with the federal and state anti-diversion and reporting obligations for distributing controlled substances. Accordingly, McMillon breached his duty of care and loyalty as an officer of the Company.

421.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Walmart has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

422.   Plaintiff, on behalf of Walmart, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste

423.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

424.   As a result of the Individual Defendants' failure to properly supervise and monitor the adequacy of the Company's anti-diversion program policy and procedures, the Individual Defendants have caused Walmart to waste its assets by paying improper compensation and bonuses to certain of its officers and directors that breached their fiduciary duty. The Individual Defendants' misconduct has also

caused the Company to expend millions of dollars on needless legal fees and defense costs.

425.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

426.   Plaintiff, on behalf of Walmart, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

427.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

428.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Walmart. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Walmart.

429.   Plaintiff, as a stockholder and representative of Walmart, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

430.   Plaintiff, on behalf of Walmart, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Finding that this action is a proper shareholder derivative action and that Plaintiff is an adequate representative of the Company's interests;

B.     Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C.     Finding that the Current Director Defendants violated section 14(a) of the Exchange Act;

D.     Finding that the Individual Defendants breached their fiduciary duties to the Company and its stockholders;

E.     Finding that the Individual Defendants wasted the Company's assets;

F.     Finding that the Individual Defendants were unjustly enriched;

G.     Awarding the Company the damages it sustained as a result of the Individual Defendants' misconduct, as well as pre-and post-judgment interest;

H.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over the distribution of opioids;

2.    a proposal to strengthen the Board's oversight of its diversion control and order monitoring procedures;

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.    a provision to permit the stockholders of the Company to nominate at least three candidates for election to the Board;

I.    Awarding to Plaintiff his costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses and, if applicable, pre- and post-judgment interest; and

J.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: February 9, 2021

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
David M. Klauder (No. 5769)
1204 N. King Street
Wilmington, DE 19801
(302) 803-4600
rernst@bk-legal.com
dklauder@bk-legal.com

**LEVI & KORSINSKY, LLP**
Gregory Mark Nespole
Daniel Tepper
Correy A. Kamin
Ryan Messina
55 Broadway, 10th Floor
New York, NY 10006
(212) 363-7500
gnespole@zlk.com
dtepper@zlk.com
rmessina@zlk.com

*Counsel to Plaintiff*